# Leslie A. Gilmore, Eugene Munger and Julius D. Klein, v. The People, etc.

1. CRIMINAL PROCEDURE—*Affidavits of Grand Jurors Can Not be Received to Impeach an Indictment.*—On grounds of public policy, affidavits of grand jurors can not be received to impeach an indictment found by them.

2. SAME—*Witnesses Names on Indictments.*—The name of a witness who is called, but refuses to testify before the grand jury, may be properly omitted from the back of the indictment.

3. SAME—*Organization of the Grand Jury—How Questioned.*—The organization of the grand jury can not be questioned in this State by a plea in abatement, but only by a challenge to the array or a motion to quash the indictment.

4. SAME—*What Pleading to an Indictment Admits.*—Pleading to an indictment admits its genuineness as a record, for an averment by way of plea can not be received against a record.

5. SAME—*Bills of Particulars.*—Whenever an indictment is so general as to give the defendant inadequate notice of the charge that he is expected to meet, the court will, on his application, require the prosecution to furnish him a bill of particulars of the evidence intended to be relied upon.

➤ 6. SAME—*Reference to Defendant's Failure to Testify.*—The neglect of a defendant to testify in his own behalf in a criminal proceeding creates no presumption against him, and any reference or comment upon such neglect to testify, made by the prosecuting attorney, is error.

7. SAME—*What is No Defense.*—It is no defense to a criminal prosecution that the crime was committed against one who was also engaged with the defendants in another criminal enterprise.

Error to the Circuit Court of Carroll County; the Hon. JAMES SHAW, Judge, presiding. Heard in this court at the October term, 1899. Reversed and remanded. Opinion filed February 1, 1900.

FRANK P. BLAIR, attorney for plaintiffs in error; J. M. HUNTER, of counsel.

RALPH E. EATON, State's Attorney, and JOHN D. TURN-BAUGH, attorneys for defendants in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

Leslie A. Gilmore, Eugene Munger, George Taber, Julius D. Klein and Harry Romaine, were indicted in the court below for a conspiracy to obtain the money of Roderick Chisholm and Ade O. Hileman by false pretenses and by means and use of the confidence game. Romaine was not put on trial. Taber pleaded guilty and testified for the prosecution. After certain proceedings hereafter stated, Gilmore, Munger and Klein pleaded not guilty, and were tried and convicted; Gilmore and Klein were fined, and all three were sentenced to imprisonment in the penitentiary, and they have sued out this writ of error.

Defendants filed a written motion to quash the indictment, assigning among other reasons that it was not sufficient in form, and that Taber was a witness before the grand jury and his name was not indorsed upon the back of the indictment. The form of the indictment is in the language of the statute, and is supported by Thomas v. People, 113 Ill. 531; Ochs v. People, 124 Ill. 399; Graham v. People, 181 Ill. 477, and other Illinois decisions. Defendants sought to prove Taber was a witness before the grand jury by the affidavits of grand jurors. On grounds of public policy these can not be received to impeach an indictment. (Gitchell v. People, 146 Ill. 175.) Other proof presented by the State showed that though Taber was called before the grand jury and sworn, he refused to testify, and did not testify before that body. His name was properly omitted from the back of the indictment, and the motion to quash was properly denied.

Thereafter defendants filed a plea in abatement, to which the court sustained a demurrer. The plea questioned the legality of the grand jury on the ground that the number of grand jurors selected by the county board was not " as near as may be a proportionate number from each town," as required by statute. The organization of a grand jury

can not be questioned in this State by a plea in abatement, but only by a challenge to the array or a motion to quash the indictment. (Stone v. People, 2 Scam. 326; Barren v. People, 73 Ill. 256; McElhanon v. People, 92 Ill. 369.) Pleading to an indictment admits its genuineness as a record, and an averment by way of plea can not be received against a record. (Gitchell v. People, *supra*.) Defendants did not challenge the array, and their written motion to quash the indictment did not attack the organization of the grand jury, nor did they, on the hearing of the motion, offer any proof concerning its selection.

Further, the plea shows there are fourteen towns in Carroll county; that one grand juror was selected from each town, and no more than two from any town, and we think it shows a reasonable compliance with the statute.

Defendants before pleading to the merits moved for a bill of particulars, and supported their motion by their joint affidavit, in which they set out the very general nature of the allegations in the several counts of the indictment, and its lack of that definiteness and particularity which would apprise them of the nature of the accusation against them, and that they desired a bill of particulars which would enable them to prepare their defense, and in case of acquittal or conviction to show by the record the identity of the crime charged, so that they might not be placed in jeopardy a second time for the same offense. Their affidavit further stated :

" That these defendants intend in good faith to defend themselves against the supposed crime intended to be alleged against them in said indictment; but that they are ignorant of the facts constituting the same, and can not safely go to trial herein until there shall be rendered to them a bill of particulars, or statement of the facts constituting the offense or crime intended to be charged against them, with such certainty as will apprise them of the nature of the accusation against them, and enable them to prepare their defense herein, and that such bill of particulars is important, material and necessary to the defense of the defendants in this cause."

Defendant Munger also filed a separate petition under

oath for a bill of particulars, in which he stated that there were three indictments against him; that he was innocent of each charge against him; that he had not had a preliminary hearing upon any of said charges; that he did not know and had no information what evidence would be introduced against him, and that he could not learn the same from the indictments because of their general language; that he had made every effort to ascertain what the witnesses indorsed upon the indictment knew or claimed to know against him concerning said charges; that he needed a bill of particulars to insure him a fair trial; that he might not be surprised upon the trial; that he might make suitable preparation for trial, etc. No counter-showing was made by the State. The court refused to require a bill of particulars.

We can not concede the position taken by the State that an application for a bill of particulars is always addressed to the mere discretion of the trial court, and that its exercise hereof is never subject to review. Some counts of the indictment in McDonald v. People, 126 Ill. 150, were much like the indictment in this case. Upon this subject the court there said:

" Where the charge in an indictment is a general one, as is usually the case in an indictment of this character, it is a matter of great importance to the defendant to obtain a bill of particulars, in order that he may know specifically what he will be required to meet on the trial."

The court there quoted with approval from another court which spoke of " the reasons which require a specification," and from still another court to this effect:

" It is now a general rule, perfectly well established, that in all legal proceedings, civil or criminal, bills of particulars, or specifications of facts, may and will be ordered by the court whenever it is satisfied there is danger that otherwise a party may be deprived of his rights or that justice can not be done."

In C. & N. W. R. R. Co. v. C. & E. R. R. Co., 112 Ill. 589 (a condemnation case), the trial court denied a motion to compel petitioner to file a certain plan and profile. The Supreme Court said:

" This motion was in the nature of an application for a bill of particulars, which is demandable in all kinds of actions and proceedings where, by reason of the generality of the claim or charge, the adverse party is unable to know, with reasonable certainty, what he is required to meet. (1 Tidd's Practice, 1st Am. Ed. 334–336.) The rule applies even to criminal proceedings as well as civil. Wharton, in his work on Criminal Law, Vol. 3, Sec. 3156, says : ' Whenever the indictment is so general as to give the defendant inadequate notice of the charge he is expected to meet, the court will, on his application, require the prosecution to furnish him a bill of particulars of the evidence intended to be relied upon.' The practice in this respect is founded upon the clearest principles of justice, and should not be departed from in any case where the circumstances require an application of the principle."

Some of the counts of this indictment charge a conspiracy to obtain the money of Chisholm and Hileman, and to cheat and defraud them of the same, by means and use of the confidence game. Others charge a conspiracy to obtain the money of Chisholm and Hileman by false pretenses. The nature of the confidence game is not stated. The false pretenses are not set out. The money is in some counts described as $5,000 of money of the value of $5,000, and in others as divers large sums of money amounting to the sum of $5,000, and of the value of $5,000. The details of the conspiracy are not set out. In every respect the indictment is as general as it could be drawn. We are of opinion the showing made entitled defendants to a bill of particulars as matter of right, and that such a bill was necessary to enable them to prepare their defense. The State suggests they were not harmed by its refusal because, near the close of the · trial, a witness stated that as a justice of the peace he held a preliminary examination of the charge of conspiracy in the case of " The People against J. D. Klein and others," and therefore defendants must have been informed of the case against them by that examination. The witness did not state who were the other defendants before him besides Klein, nor the extent of that examination. Munger's sworn petition stated that he had not had a preliminary hearing, and did not know, and had no information of any kind

whatever, of the matters, things, declarations and statements, if any, that would be introduced in evidence against him, except from the indictment. It also appeared that there were three indictments against the defendants, and they had a right to know whether the State intended at the trial of this case to prove and rely upon all the transactions between the parties, or only some special part thereof. The hardship entailed upon defendants by the denial of the bill of particulars was obvious at the trial. The defendants were charged with committing the crime in Carroll county. Many conversations and transactions relied upon by the State were had in Carroll county. Much of the money actually paid out by Chisholm and Hileman was paid in Carroll county. But it did not appear Munger was ever in Carroll county till after his arrest. Several different sums of money were paid by Chisholm and Hileman, but no one sum of $5,000, nor did they all amount to $5,000, and the sum finally refused was not $5,000. The first pretenses claimed to have been false and fraudulent, and the first acts in the alleged conspiracy, were made and done in Carroll county on March 18, 1899. Most of the alleged false pretenses were made, and large sums of money were obtained from Chisholm and Hileman during the next thirty days, and much evidence was introduced covering that period. Gilmore was not shown to have had any connection whatever with the parties, the conspiracy, or the false pretenses till April 20th, only nine days before the last transaction put in evidence. Gilmore is not shown to have ever been in Carroll county till April 24th, only five days before the close of the period covered by the evidence. The trial lasted nine days. The great bulk of the evidence introduced related to conversations and transactions with which it was not shown that Gilmore was personally connected or acquainted. It is obvious the refusal of a bill of particulars deprived him of information to which he was entitled before the trial. For this error the judgment must be reversed.

The case which the State sought to prove was in part as

follows: Chisholm and Hileman were men of some wealth, living in Carroll county. Taber and Klein also lived in that county. Munger, Romaine and Gilmore lived in Chicago. Gilmore was an attorney. Romaine was represented to be a telegraph operator. It was represented to Chisholm and Hileman that Munger and Romaine had a scheme for tapping telegraph wires running to a pool room in Chicago, and conducting the wires into a room near by, intercepting and delaying reports of horse races, till one of them could go to the local pool room and bet on the winning horse; then sending on the report and winning large sums of money; that they had bought and partly paid for the necessary machinery, but needed $337.50 more to enable them to complete the arrangements, and wanted some one to go in with them, furnish the remaining money needed, and share in the profits. Chisholm and Hileman accepted the offer and furnished the required money. Then followed, during the next twenty-five or thirty days, numerous calls for more money on various pretexts, such as that the machinery had been burnt out by an unusual charge of electricity upon the wires; that a "resister" was required; that the telegraph company had run a second wire to the pool room and sent part of the report over one wire and part over the other, and hence the machinery must be duplicated, etc. Chisholm and Hileman responded to these various demands, and prior to April 20th they had paid out $2,600. Then they were notified that Munger and Romaine, who were known in these transactions as Vaughn and Martin, had been arrested by the police on a charge of tapping telegraph wires, in violation of the statute, and were confined in the central station, Chicago, and the machinery had been seized; that a lawyer named Gilmore had been hired and paid $100 to defend them, and that $500 was needed to get them out on "straw bail." Chisholm and Hileman furnished the money, and were afterward notified that Munger and Romaine had been released. Gilmore and Romaine then came to Carroll county and had an interview with all the parties, except Munger. Gilmore stated that the offense

Gilmore v. The People.

of tapping wires was punishable by imprisonment in the
penitentiary or a heavy fine; that the possession of the
machinery by the police, which he said was at the central
station, furnished serious evidence against them all; that
that was all the evidence the police had, and if they could
get the machinery back it would destroy all evidence of
guilt; that he thought he could buy off the police, get the
machinery back, and square everything, for about $2,000;
and Romaine stated that the machinery could be returned
to the house from which it was bought at a discount of ten
or twenty-five per cent, so that there would be no great loss.
Gilmore returned to Chicago to ascertain the exact amount
required, and wired back it would take $2,100.   Chisholm
and Hileman raised that sum and placed a draft therefor
in the hands of Taber to take to Chicago.   Meanwhile Hile-
man had stated the facts to his brother-in-law, W. Scott
Cowen, and the latter went to Chicago to investigate the
matter.   He rode on the train with defendant Klein, and
the latter, after a long conversation, told Cowen that this
was really a scheme to get money out of Chisholm and
Hileman.   Cowen consulted a Chicago lawyer whom he
knew, named George C. Mastin, a former resident of Car-
roll county, and brought Mastin back with him that night.
They got Chisholm, Hileman and Taber together, and
induced Taber to surrender the draft for $2,100.   Mastin
returned to Chicago and called upon Gilmore to learn the
facts, the danger of his clients, and the necessity for their
paying out $2,100.   After some discussion Gilmore told
him Munger and Romaine had been arrested, but that the
story of their having been placed in the central station was a
"fake;" that Chisholm was badly scared and was raising
money to escape, and would give up a good many thousand
dollars rather than be punished; that the guilt of the parties
was so evident that they could not be defended; that he
was expecting Taber in with $2,100; that if Mastin would
advise his clients to give up the $2,100 he (Mastin) should
have one-third of it; and the balance had to be divided
between himself and another; that the payment of $2,100

would be much less punishment than they would suffer if they were arrested and sent to the penitentiary; that if they paid the $2,100 they would be relieved from all danger of prosecution and arrest; that he represented Romaine and Munger, and also represented the party who had caused their arrest, and also the party who had furnished their bonds, and that he controlled the situation. Mastin retired and sent Gilmore a note saying that upon consideration he found he could not with honor either consider or accept his suggestion. Mastin and Gilmore met again next day, and Gilmore told Mastin that the latter did not correctly get the import of his remarks the day before, and gave Mastin the name of the justice before whom the prosecution of Munger and Romaine (under the names Vaughn and Martin) was pending, and the date to which the hearing had been continued. Mastin told Gilmore he believed his clients would resist any efforts to induce them to give more money to save them from any sort of prosecution. The $2,100 was not paid, but this prosecution was instituted. It was shown that Munger and Romaine had never been confined in the central station, either under their own names or the names Vaughn and Martin, nor had any such machinery been there; that wire-tapping machinery of the kind described would cost but a few dollars, and that the most expensive machinery would not have cost over $350. There was evidence slightly tending to show that wires were in fact tapped and two bets on horse races made, and counter evidence casting much doubt upon the existence of any wiring, tapping or betting by any of these parties. Chisholm and Hileman were at least made to believe that wires had been tapped and bets made. Many conversations, representations and acts were proven, to which we deem it unnecessary to refer.

The defense offered but little testimony. They showed a prosecution under the statute for tapping telegraph wires had been instituted against Vaughn and Martin; that said defendants had been arrested, had given bail, and that the case had been continued, and afterward it was dismissed for

want of prosecution.  Proof was offered tending to contradict Martin in some of the details he gave of his visit to Gilmore's office.  The defense contend that the credibility of Chisholm and Hileman is affected by the criminality of the enterprise in which they were, or supposed they were, engaged; that Taber's credibility is affected by his confessed guilt; that if any crime is shown, it was committed in Cook county, and not in Carroll county; and that as Chisholm and Hileman were engaged with defendants in a criminal transaction, none of them can be convicted for cheating or attempting to cheat a confederate therein.

The defendants who were on trial did not testify in their own behalf.  Sec. 6 of Div. 13 of the Criminal Code, which removes the disqualification of a defendant in a criminal case to testify, further provides that " a defendant in a criminal case or proceeding shall only at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect."  During the argument of the State's attorney to the jury he said:

" Mastin may have been mistaken about the door in Gilmore's office, but if his testimony be not true Gilmore could have taken the witness stand and contradicted him, word for word."

Gilmore excepted to these remarks and the court said, " Mr. Eaton, that is not proper."  The State's attorney continued as follows :

" I would have no right to say so, your honor, but Gilmore brought it up in his argument.  Gentlemen of the jury, Gilmore said his mouth was sealed, and that he could not go on there and contradict Mastin.  Now, gentlemen of the jury, I would have no right to say anything about this except that he brought it up in his argument himself. I say that when Gilmore told that, he knew he was telling a falsehood to the jury, and I tell him in the presence of his honor, the court, that he had the right to go upon that witness stand and contradict Mastin word for word."

Gilmore objected to these remarks on the ground that he

had made no such remark, and that the same violated his
constitutional right, and requested the court to adjure the
jury to disregard said remarks of counsel, but the court
failed to do so, to which refusal of the court Gilmore excepted.

The record discloses that Gilmore examined witnesses in
his own behalf and cross-examined some of the witnesses
against him. The inference from the remarks of the State's
attorney would be that Gilmore had also addressed the jury
in his own behalf, though that does not otherwise appear.
The State's attorney sought to justify his remark to the jury
by the claim that Gilmore had told the jury he was not per-
mitted to testify. Gilmore denied he had so stated. If
Gilmore had made any statement which opened the door for
these remarks the trial judge should, and we must assume
would, have caused the facts to be stated in the bill of
exceptions. It was also the duty of the State's attorney to
see that the facts upon the subject were incorporated in the
bill of exceptions. In its silence we can not assume that
the State's attorney had any warrant for this violation of
the defendant's statutory rights. In every case where this
question has been presented to our Supreme Court (so far
as we are advised), if there had been a direct reference by
the State to the failure of the defendant to testify, it has
been held to require a reversal, unless the guilt of the de-
fendant was so evident that the jury could have reached no
other conclusion. (Angelo v. People, 96 Ill. 209; Austin v.
People, 102 Ill. 261; Baker v. People, 105 Ill. 452; Quinn v.
People, 123 Ill. 333.) The Quinn case was reversed solely
because an attorney who was assisting the State's attorney
in his argument to the jury asked why, if certain evidence
was not true, defendant did not go upon the witness stand
and deny it. In that case the trial judge stopped the attor-
ney and told the jury his remarks were improper. But the
court said the words had served their purpose and the effect
upon the jury could not be removed by the declaration of
the judge. In the Austin case the court said that the stat-
ute can only be completely enforced by adopting it as a rule
of practice that such improper and forbidden reference

by counsel for the prosecution shall be regarded as good ground for a new trial in all cases where the proofs of guilt are not so clear and convincing that the court can say affirmatively the accused could not have been harmed from that cause.

" In the absence of most satisfactory proof of guilt, no conviction, obtained through a palpable and willful violation of law (to the prejudice of the accused) done by the officers of the law conducting the prosecution, should be allowed to stand."

The conviction of Gilmore rests upon the evidence of Mastin. Aside from the testimony given by Mastin, Gilmore's acts appeared to be those of an attorney seeking to extricate clients from a serious position; and though the means he proposed were grossly illegal, that would not convict him of this crime. Gilmore introduced two witnesses to prove facts as to the circumstances of the interview tending to contradict Mastin. He had a right to have his case go to the jury unprejudiced by comments upon the fact that he had failed to avail himself of his privilege to testify. The language of the State's attorney therefore requires a new trial; and its effect could not fail to be prejudicial to the other defendants also. The jury could hardly fail to understand that the other defendants also could have testified.

We see no substantial and reversible error in the rulings of the court upon the evidence. The letter from Mastin to Gilmore was competent evidence for the State, because it was followed by another conversation between those parties which Gilmore began with a reference to the contents of the letter.

The defense asked instructions based upon the theory that if Chisholm and Hileman were engaged in a criminal transaction with defendants, and in that transaction defendants cheated Chisholm and Hileman and defrauded them of their money, then the defendants could not be convicted. These instructions the court refused. The State asked instructions based upon the contrary doctrine, that the fact that Chisholm and Hileman were engaged in a criminal

transaction with defendants would not exonerate defendants if they had committed against Chisholm and Hileman the crime charged in the indictment. These instructions the court gave. The rule contended for by defendants is based chiefly upon the majority opinion in McCord v. People, 46 N. Y. 470, and upon State v. Crowley, 41 Wis. 271. In the former the rule was thus stated :

"Neither the law nor public policy designs the protection of rogues in their dealings with each other, or to insure fair dealing and truthfulness, as between each other, in their dishonest practices. The design of the law is to protect those who, for some honest purpose are induced, upon false and fraudulent representations, to give credit or part with their property to another, and not to protect those who, for unworthy or illegal purposes, part with their goods."

We entirely approve the doctrine as applied to a civil suit between rogues for contribution or reimbursement, but we think it has no proper application to a criminal prosecution against one of several wrongdoers for a crime committed against a fellow-criminal. Though the aggrieved fellow-wrongdoer may be the one who makes the complaint, yet it is not necessary that he seek or desire the prosecution. Any one who knows that a crime has been committed may initiate the prosecution. The complaining witness, whether he is or is not the person defrauded, can not control or settle or abandon a prosecution once begun. The proceeding is not one to enforce civil rights. It is a prosecution of the crime of the public wrong done to the people generally by the violation of a public law. The people are entitled to have the criminal punished on public grounds, for the suppression of crime and for the protection of the public against other like crimes, no matter how unworthy the source from which the proof may come. One crime can not be permitted to become a shield against the punishment of another crime. One who has committed a crime ought not to escape punishment by showing that another person ought also to be punished for the same or another crime. Public policy requires that both be punished, and not that both be permitted to escape because

of their mutual relations.   These views find full expression and illustration in People v. Hennsler, 48 Mich. 49; People v. Watson, 75 Mich. 578; Commonwealth v. Morrill, 62 Mass. 571; Patterson v. State (N. J.), 40 Atl. Rep. 773; In re Cummins, 16 Colo. 451.   We are of opinion these cases rest on sound legal principles and state a salutary rule. See also the dissenting opinion of Peckham, J., in McCord v. People, *supra*.   This precise question seems not to have been decided in this State, but a conviction was sustained in Maxwell v. People, 158 Ill. 248, where the prosecuting witness was cheated while he was, as he supposed, assisting the defendant in cheating another person.   We approve the rulings of the trial court on this subject.

The instruction given for the people, defining " overt act," was so general as to be inaccurate as applied to this case.   There was proof of overt acts in Carroll county sufficient to justify the verdict as to the venue.   Taber had pleaded guilty and turned State's evidence, and his cross-examination was unduly restricted.   Some other rulings are perhaps open to criticism, but they are not likely to occur on another trial, and we think they do not require discussion here.

For the errors indicated, the judgment against Gilmore, Munger and Klein is reversed, and the cause is remanded for a new trial.