Argued October 17; affirmed November 14; rehearing denied
December 12, 1939

# STATE *v*. MELLENBERGER ET AL.

(95 P. (2d) 709, 128 A. L. R. 1506)

In Banc.

*Leroy L. Lomax,* of Portland, for appellants.

*L. G. English,* District Attorney, of Toledo, for respondent.

ROSSMAN, J. This is an appeal by W. L. Thompson and Fred Mellenberger, two of the three indictees, from a judgment of the circuit court which found them

guilty of the crime of obtaining money through the use of false pretenses in violation of 1937 Session Laws, Ch. 107. The indictment names Florence Tyler as the victim. A third defendant, Thompson's wife, was acquitted. None of the defendants testified.

The appellant Mellenberger contends that, if the evidence discloses that he obtained money from Miss Tyler through the employment of false pretenses she was a particeps criminis and that, therefore, he should have been acquitted. The appellant Thompson argues that the state presented no evidence indicating that he had any connection with the crime described in the indictment.

A brief review of the evidence is the following: November 26, 1938, Miss Tyler was an employee in the Depoe Bay Tavern in which was kept and used a gambling device known as a punchboard. The parties agree that the operation of this board constituted a violation of our laws and cite § 14-801, Oregon Code 1930. The board had provision for 1440 punches. Its patrons paid 10 cents for each play. A punch forced from the board a slip of paper bearing a number. Upon the face of the board was a statement that the following were the winning numbers and prizes:

| | | | | |
|---|---|---|---|---|
| 101,102 | $10.00 | | 105,106 | $ .50 |
| 102,103 | .50 | | 106,107 | .50 |
| 103,104 | .50 | | 107,108 | .50 |
| 104,105 | .50 | | 108,109 | .50 |

November 26, 1938, about noon, Thompson entered the tavern and, after paying 10 cents to Miss Tyler, punched from the board a number. It won nothing, and he then left. Two hours later Mellenberger, who had never been in the place before, entered and paid for four punches. Miss Tyler testified: "About the

third punch he opened it up and said it was the winning number, calls for $10.00, and pushes it out towards me.'' Miss Tyler hesitated for a few moments while she compared the slip of paper which Mellenberger had handed to her with another slip which had won a previous prize. Mellenberger evidenced impatience during the delay and declared that he had won the $10.00 prize ''fair and square.'' He demanded its payment. Shortly Miss Tyler handed to him $10 and he then left. The occurrence attracted the attention of H. O. Youngblood and D. R. Smith, who, upon Mellenberger's departure, examined the slip of paper which he had handed to Miss Tyler and discovered—at least they so said—that the number had been altered so as to make it read 101,102. Upon this discovery Miss Tyler, Youngblood and Smith began a search for Mellenberger. The latter had already left Depoe Bay, but the three after driving 14 miles north along the Coast highway found Mellenberger and the other two defendants in another tavern. Youngblood thus described what occurred when he spoke to the defendants: ''I tried to talk to them, but they wouldn't talk. They just said it was too bad and got in the car and pulled right out.'' At this point Miss Tyler left the car of her two companions in order to seek a police officer. Youngblood and Smith followed the automobile in which the defendants proceeded north. At Otis, 19 miles from Depoe Bay, a police officer was encountered and after Smith and Youngblood had told him what had happened he took in pursuit of the three defendants. He arrested them some distance beyond Otis. The defendants were brought to Newport where a search was made of their car. The evidence does not indicate which of the three owned the car nor which was its driver. In the car were found

hundreds, if not thousands, of small pieces of paper which had been punched out of punchboards. In it were also found an ink eraser and several rubber type. The evidence indicates that the paper presented by Mellenberger to Miss Tyler had been altered.

The defendants argue that Miss Tyler was particeps criminis in the commission of the crime averred in the indictment, and that therefore the state cannot maintain this prosecution. Their brief says: "A case that is on 'all fours' with the case at bar is State v. Alexander, 76 Or. p. 329."

*State v. Alexander* was an appeal by the state from an order of the circuit court which sustained a demurrer to an indictment which charged that the defendant, an Indian woman, obtained $1,150 from a man named Bannister by untruthfully representing to him that she had a lawful right to lease, without first obtaining the approval of a federal official, a tract of land owned by her and located in the Umatilla Indian Reservation. A federal statute provided that land in the reservation was held in trust for the allottee by the federal government, and that transactions in regard to it were null and void unless approved by the reservation superintendent or the Secretary of the Interior. Another federal law rendered it a misdemeanor for anyone to induce an Indian to execute a contract or other instrument transferring an interest in his land. In sustaining the circuit court's order, this court, after mentioning these statutes, declared that Bannister was as much charged with their knowledge as was the defendant. Next, the decision, referring to Bannister, stated:

"He was particeps criminis in the fraud to obtain these lands in violation of the particular language of the statute, which was a violation of the criminal law."

The opinion mentioned *People v. Stetson*, 4 Barb. 151, *State v. Crowley*, 41 Wis. 271, 22 Am. Rep. 719, and *McCord v. People*, 46 N. Y. 470, but no others. From the Stetson and McCord decisions the opinion quoted statements that statutes penalizing the use of fraud as means of obtaining money were enacted for the protection of innocent persons and not for the benefit of participes criminis. From the Crowley decision a similar observation was quoted and also a statement that the court (Wisconsin) had been unable to find any decision holding that a transaction in which the defrauded party's conduct was not lawful was within the purview of such legislation. *State v. Alexander* also quoted the concluding part of the Crowley decision in which the court said that the New York decisions were "supported by better reasons," and that it was adopting the New York rule "with reluctance because the acts of the defendants as disclosed by the evidence were outrageous and indefensible and the perpetrators richly merit punishment."

It will be noticed that the Alexander decision developed two reasons for its conclusion: (1) Bannister was charged with knowledge of the federal statutes which withheld from Indians the right to lease their land without the approval of the appropriate federal officials; therefore, he had notice that the defendant's representations were unwarranted. (2) He was a particeps criminis with the defendant, and therefore her illegal conduct shielded him.

If the fact that a defrauded party's conduct in the challenged transaction in any way violated a criminal

law excuses the defendant, then the judgment now before us must be reversed. That being true, we studied *State v. Alexander* very carefully. We observe that that appeal was presented to this court without oral argument. Professor Orfield, in his excellent volume entitled Criminal Appeals in America (p. 158), declares:

"One of the most important stages of a criminal appeal is the oral argument. Perhaps it is more accurate to say that it could be and ought to be one of the most important steps. * * * It is thought to be the means of preventing 'one man' opinions."

He quotes the following from the recommendations made in 1938 by the Judicial Section of the American Bar Association (p. 101, Judicial Section Report):

"The oral argument when properly employed is an extremely effective aid to a correct decision."

The Alexander decision was reached without the help of oral argument.

We have read the briefs submitted in the Alexander case. The state's (appellant's) opening brief was only eight pages in length and submitted five points as bases for a reversal. The fifth was a declaration that even though Bannister was also punishable, the defendant was nevertheless subject to conviction for the crime committed by her. This contention, while accompanied with citation to some old decisions, was not argued in the brief.

The defendants' brief totally ignored the proposition just mentioned. It argued (a) that the indictment failed to aver that Bannister relied upon the representations of the defendant and that, therefore, the indictment was defective; and (b) that since the land was part of an Indian reservation, and since the owner

was a ward of the federal government which had prescribed limitations upon her right to part with any interest in it, Bannister was charged with notice that any failure to follow the prescribed course had only one result: the invalidity of the transaction—not punishment of the Indian owner which might operate coercively upon the latter. The defendant in that case nowhere contended that Bannister and the defendant were participes criminis, nor that Bannister's guilt shielded her. The state's reply brief set forth twenty-one propositions, three of which restated the state's contention that even if the defendant and Bannister were participes criminis, the indictment charged a crime. It will be observed that only one side of the issue now before us was briefed in the Alexander appeal.

The statute (1937 Session Laws, Ch. 107), upon which the indictment is based, reads:

"If any person shall, by any false pretenses or by any privity or false token, and with intent to defraud, obtain or attempt to obtain from any other person any money * * * such person, upon conviction thereof, shall be punished * * *."

It will be observed that the statute says that if any person by the exercise of false pretenses shall obtain money "from any other person" he is guilty of the prohibited offense. Thus, the statute does not recite, at least not expressly, an exception rendering it lawful to defraud those whose purposes are culpable. Nor does it say that the pretext must be lawful if true. In endeavoring to obtain some idea of the number of individuals who would become lawful prey for fraudulent schemes if the exception proposed by these defendants is to be read into the act, we have studied numerous

decisions of other courts (most of which are reviewed in the annotations appearing in 95 A. L. R. 1249, 17 L. R. A. (N. S.) 276, and 13 Ann. Cas. 562) which were concerned with the same issue.

In *People v. Stetson,* supra, the scheme employed by the defendant was this: he untruthfully represented to one Barlow that he was a constable and showed Barlow a warrant, apparently valid, but in fact forged, for Barlow's arrest upon a charge of rape. Barlow, confronted with this outrageous situation, paid money to avoid arrest. In *McCord v. The People,* supra, the defendant at a late hour of the night falsely represented to one Miller that he was an officer with a warrant for Miller's arrest upon a charge of assault, and threatened to take Miller to jail. Miller thereupon parted with $200. In *People v. Tompkins,* 186 N. Y. 413, 79 N. E. 326, 12 L. R. A. (N. S.) 1081, the defendant and his confederates induced one Felix to part with $50,000 upon the false representation that the defendant was an employee of a telegraph company and had the means of obtaining advance information as to the result of horse races which were the subject of bets in a poolroom. Felix entered the poolroom and made a bet upon a horse falsely named by the defendant as the winner; he lost. In *People v. Klock,* 55 Misc. 46, 106 N. Y. S. 267, one Gallagher, who had illegally cut some logs from state lands, paid $3,750 to the defendant, a state game protector, who fraudulently represented that he had the right on behalf of the state to settle for the wrong done by Gallagher. In *People v. Clough,* 17 Wend. 351, 31 Am. Dec. 303, the defendant, by falsely representing himself to be deaf and dumb, obtained donations of money. In *In re Leano,* 60 Misc. 520, 113 N. Y. S. 1115, the defendant obtained money by pretending that he

had stolen $25,000 which he would share with the complaining witness. In *People v. Williams*, 4 Hill 9, 40 Am. Dec. 258, the defendant obtained a deed from one Van Guilder by deceiving him into a belief that proceedings were about to be instituted against him for a debt. In *People v. Livingstone*, 47 App. Div. 283, 62 N. Y. S. 9, the defendants obtained $500 from their victim described in the decision as "a stranger from the West," by agreeing to send him $3,000 in counterfeit money.

In *Lawson v. State*, 120 Ark. 337, 179 S. W. 818, the defendant untruthfully represented himself to one Deakin as a revenue officer charged with the duty of arresting Deakin for dealing in counterfeit money. Deakin paid him $300 to forego the arrest. In *Hicks v. State*, 140 Ark. 37, 215 S. W. 685, the defendant in the prohibition period obtained $21 from one Drake for four bottles containing colored water which he represented contained whiskey. In *Johnson v. State*, 75 Ark. 427, 88 S. W. 905, the defendants obtained money from their victim by falsely representing that bets were to be made upon a sure winner in a footrace and that the money was needed to create an appearance of respectability.

In *People v. Martin*, 102 Cal. 558, 36 P. 952, the false representations were that a judgment had been obtained against one Sarah Leonard in the state of New York as a result of which Mrs. Leonard transferred all of her property to the defendant in order to avoid its application to the satisfaction of the fictitious judgment. In *People v. Howard*, 135 Cal. 266, 67 P. 148, the scheme was a perjured affidavit and the production of 12.000 squirrel tails whereby Tulare County, which had illegally passed an ordinance offering a bounty

for squirrels killed in the county, paid the defendant bounty money. In *People v. Hall*, 133 Cal. App. 40, 23 P. (2d) 783, the scheme was a wrongful representation that the money sought was to be bet upon horse races in which the names of the winners were already known. In *People v. Shwartz*, 43 Cal. App. 696, 185 P. 686, the defendant induced his victim to pay him money by falsely representing that he had influence with a police commission and could procure the massage parlor license that the victim desired. In *People v. Abbott*, 65 Cal. App. 120, 223 P. 77, the facts were similar to those in *Hicks v. State*, supra. In *People v. Edwards*, 72 Cal. App. 102, 236 P. 944, money was obtained by false representations that it would be used to bribe public officers to drop criminal charges under investigation against the defrauded woman's husband.

In *In re Cummins*, 16 Colo. 451, 27 P. 887, 13 L. R. A. 752, 25 Am. St. Rep. 291, the defendant, by falsely representing to his victim that he would fraudulently obtain for him valuable government lands, obtained his victim's money.

In *Foster v. State*, 8 Ga. App. 119, 68 S. E. 739, the defendant obtained $100 from a Mrs. Robertson by representing to her that it would secure for her not only membership in a lodge, but also $500 in counterfeit money available to all initiates.

In *Gilmore v. People*, 87 Ill. App. 128, the defendants falsely represented to R. Chisholm and A. Hileman that they had a scheme for tapping telegraph wires which entered a poolroom. Their representations and pretexts induced Chisholm and Hileman to part with $2,600 under the belief that the defendants needed it to buy equipment. Then the defendants by falsely stat-

ing that they had been arrested, that their device had been seized by the police and that Chisholm and Hileman were in danger, induced the victims to part with more money. In *People v. Koscielmiak*, 257 Ill. App. 514, the defendant obtained $200 from Rose Dobrowski by falsely representing that he was a brother of the court's clerk in which a charge was pending against the woman's brother, and that he could fix the case. In *Maxwell v. People*, 158 Ill. 248, 41 N. E. 995, one of the two defendants, after obtaining the confidence of a farmer by pretending to explain a card trick, induced him to venture some money upon the trick when the second defendant, who appeared to be a stranger to the first and unfamiliar with the trick, appeared and desired to place a wager.

In *Casily v. The State*, 32 Ind. 62, false pretenses enabled the defendant to obtain a loan from the prosecuting witness for the purpose of using the money in wagering. In *Crum v. The State*, 148 Ind. 401, 47 N. E. 833, the prosecuting witness was a farmer, one of the two defendants was a bank president, and the other was an agent for the Continental Insurance Company. The two obtained $1,000 from the farmer by falsely representing that through the insurance company's bank they could obtain for him counterfeit money. In *Perkins v. The State*, 67 Ind. 270, 33 Am. Rep. 89, the defendants obtained money from their victim, Joseph Mink, by falsely representing to him that they were state marshals, that they had a warrant for his arrest on a charge of forgery, and that they also possessed authority to compromise the crime. In *Greening v. The State*, 198 Ind. 706, 153 N. E. 412, the defendants obtained their victim's money by falsely representing that they were deputy sheriffs with power to arrest

the prosecuting witnesses and close their buildings for violations of the prohibition law.

In *State v. Dobbins*, 152 Iowa 632, 132 N. W. 805, 42 L. R. A. (N. S.) 735, the defendant induced one Ballew to part with money on a horse racing scheme through a representation that the transaction was a deposit and would be returned together with a percentage of the profits. In *Commonwealth v. Morrill*, 8 Cush. 571, the defendants, by falsely representing that a watch of trifling value was made of gold and possessed many valuable features, induced one Lynch to part with two watches the qualities of which he misrepresented. In *Commonwealth v. O'Brien*, 172 Mass. 248, 52 N. E. 77, the defendant, who was about to organize a corporation, and who desired one Kearns to purchase some of its stock, fraudulently represented (1) that he owned some machinery which he proposed to transfer to the corporation; (2) that the corporation would hire Kearns; and (3) that he, the defendant, although it was unlawful to do so, would vote with Kearns on the issue of the latter's employment.

In *People v. Shaw*, 57 Mich. 403, 24 N. W. 121, 58 Am. Rep. 372, the defendant obtained $80 from his victim through the use of a scheme similar to that employed in *Maxwell v. The People*, supra. In *People v. Henssler*, 48 Mich. 49, 11 N. W. 804, the defendant, by untruthfully representing that the money to be obtained upon a note would be paid to a specified person, induced the prosecuting witness to endorse it. The latter expected that the money would be employed for unlawful purposes. In *People v. Watson*, 75 Mich. 582, 42 N. W. 1005, the defendants, after gaining the confidence of their 89-year-old contemplated victim, deceived him into believing that he had won a prize of $10,000

in a lottery and then, under a pretext that it was necessary for him to deposit $3,000 to demonstrate his responsibility, endeavored to defraud him of that sum. In *State v. Martin*, 226 Mo. 538, 126 S. W. 442, the defendants, taking advantage of the fact that the prosecuting witness had cut some timber from the land of a nonresident owner named Wilcox, pretended that one of their number was Wilcox, and through false threats of prosecution obtained $115 from the prosecutor.

In *Cunningham v. State*, 61 N. J. L. 67, 38 Atl. 847, the defendant, an attorney, by falsely representing to a woman that he was conducting some litigation in her behalf upon a claim which she believed was fictitious, obtained from her $1,800 as expense money. In *Patterson v. State*, 62 N. J. L. 82, 40 Atl. 773, the defendants, by falsely pretending to one Carrol that they had the names of witnesses who would swear that Carrol had violated the liquor laws, and by threatening to transmit their information to the grand jury, induced him to comply with their demands. *State v. Worman*, 88 N. J. L. 463, 97 Atl. 31, was another instance of obtaining hush money through threats of criminal proceedings.

In *State v. Foster*, 38 N. M. 540, 37 P. (2d) 541, 95 A. L. R. 1247 (extensively annotated) the defendants, by representing to one Bryan that they had ten cases of stolen cigarets, induced him to purchase them at a price of $300. The cases contained nothing but cotton seed.

In *Horton v. State*, 85 Ohio St. 13, 96 N. E. 797, 39 L. R. A. (N. S.) 423, Ann. Cas. 1913B, 90, the defendant obtained his victim's money by falsely promising to deliver counterfeit money. In *Commonwealth v. Henry*, 22 Penn. 253, the defendant falsely represented to one

Smith that he possessed a warrant for the arrest of Smith's daughter, and thus obtained from Smith $100 to refrain from making the arrest.

In *State v. Posey*, 88 S. C. 313, 70 S. E. 612, the defendant, after pretending that he had found a pocketbook containing a bill of a large denomination, obtained money from the prosecuting witness by representing that the money was necessary to enable the defendant to change the bill so that it could be divided between the two. In *Defrese v. State*, 3 Heisk. (Tenn.) 53, 8 Am. Rep. 1, the scheme was substantially the same as in *Maxwell v. People*, supra, and in *People v. Shaw*, supra, with the exception that a button trick was used instead of a card trick.

In *Lovell v. State*, 48 Tex. Crim. Rep. 85, 86 S. W. 758, 13 Ann. Cas. 561, the defendant falsely represented to one John Copeland, who was under arrest, that he had made arrangements with the county attorney to dismiss the criminal proceeding and thus obtained $85. In *Underwood v. State*, 49 Tex. Crim. Rep. 285, 91 S. W. 572, the facts were quite similar to those in the decision just reviewed. In *Williams v. State*, 84 Tex. Crim. Rep. 626, 209 S. W. 655, and in *Gibson v. State*, 85 Tex. Crim. Rep. 462, 214 S. W. 341, the facts were similar to those in *State v. Posey*, supra. In *State v. Crowley*, supra, in which the court declared that "the acts of the defendants or some of them, as disclosed by the evidence, were outrageous and indefensible," the defendants, through a succession of false pretenses that they would ship him some counterfeit money, obtained from one Burke several sums of money. Finally, Burke received a box which he believed contained counterfeit money, but which contained nothing but sawdust. At this point one of the defendants accused him of possessing coun-

terfeit money and threatened to expose him unless he was paid more money. The payment was made.

In *Regina v. Ewing*, 21 U. C. Q. B. 523, one Alger, for the purpose of deceiving his creditors, had transferred to the defendant in trust a tract of land and then sold it to one Hinman. Alger instructed the defendant to convey to Hinman, but the defendant, for the purpose of cheating Hinman, pretended it was necessary for him to pay the defendant $700 and give him some notes in order to create appearances of legality. The money was given and the notes were delivered, but the pretended promises to return the consideration were not kept. In *Regina v. Hudson*, Bell, C. C. 263, 169 Eng. Reprint 1254, while the three defendants and the prosecuting witness were in a drinking house one of the three temporarily left the room, leaving behind a pen case. Thereupon one of the remaining defendants, while the prosecuting witness observed what was being done, removed the pen from the case and placed it under the prosecuting witness' drinking glass. At the same time he placed a pin in the case. At this point the third defendant reappeared and now his two confederates induced the prosecuting witness to wager with the third defendant fifty shillings that there was no pen in the case. The bet was made, but when the case was opened there fell out of it into the prosecuting witness' hand not only the pin but also a pen.

We made the foregoing review for the purpose of showing that a large number of impostors would be exempted from the demands of the statute under review if it is nonpenal to defraud those who themselves seek to gain an unfair advantage. Such an aperture in the statute would render as its victims, in many instances, the aged, the ignorant and those who easily

become dupes. Every person who ever committed a wrong would become prey for those who knew of the circumstances and were willing to employ them for the purposes of blackmail.

In all of the above cases, with the exception of the Oregon, New York, Wisconsin, Georgia and two of the Texas decisions, the fact that the victims' purposes were immoral or unlawful was either held not to be a defense or was so assumed for the purposes of a preliminary matter upon which the court was passing. The two Texas decisions to which we just referred are *Williams v. State*, supra, and *Underwood v. State*, supra. In the first of these the defendant had been found guilty of ''the offense of swindling.'' He pretended that he had found a purse containing a bill of a large denomination and secured his victim's money by representing that it was needed in order that the bill could be divided between the two. The court said that the conviction ''must be reversed for any one of several reasons.'' It is ''exceedingly doubtful,'' said the court, whether a victim's act, in parting with his money in order to get something which he knew was stolen and to which he could acquire no title, could support an indictment of the kind before it. The court cited no authorities. In *Underwood v. State*, supra, the charge was theft. Since the victim had voluntarily parted with his money, the court reversed the conviction, suggesting that the charge should have been ''swindling.'' In *Lovell v. State*, supra, and in *Gibson v. State*, supra, in both of which the charge was theft through the employment of false pretenses, the convictions were sustained. In the first of these the defendant had promised to fix a criminal case, and in the second he had pretended to have found a purse containing a

bill of a large denomination and had obtained his victim's money under a pretense of sharing the bill with him. In its first decision the court reversed Lovell's conviction, but upon a rehearing affirmed it in a carefully reasoned opinion. The Gibson decision is the most recent of the four. Therefore, Texas must be classified with the courts which employ the majority rule.

Let us now review briefly the reasons which have influenced the courts. We shall first consider the courts which have employed the minority rule.

In *People v. Clough* (N. Y.), supra, in which the defendant was accused of having obtained money by falsely pretending that he was deaf and dumb, the court said that "the true reason of both the English and New York statutes was doubtless the same," and then, by quoting the preamble of the English statute, showed that it recited that evil-disposed persons by subtle stratagems had obtained money "to the great injury of industrious families." The preamble apparently convinced the court that the purpose of the statute was the protection of "trade or credit." The court held that the indictment could not be sustained. In *People v. Stetson* (N. Y.), supra, the court again quoted the preamble of the English statute showing that it had been enacted for the benefit of "industrious families" and seemed to believe that this included none but innocent persons. It, therefore, thought that Barlow's act in giving something to an impostor, who pretended to be a constable with a warrant for Barlow's arrest, rendered Barlow a particeps criminis with the impostor. It said:

"Barlow believed that the defendant was a constable, and had a warrant against him for a rape. He is

chargeable with knowledge that the law forbade any settlement or compromise of the matter and that it would be a misdemeanor to neglect to execute the process. In Attempting to cheat the law he has himself been defrauded of his watch.''

In *McCord v. People* (N. Y.), supra, the majority said:

''Neither the law or public policy designs the protection of rogues in their dealing with each other, or to insure fair dealing and truthfulness, as between each other, in their dishonest purposes. The design of the law is to protect those who, for some honest purpose, are induced, upon false and fraudulent representations, to give credit or part with their property to another.''

*Foster v. State,* supra, being the Georgia decision, cited no authorities. As is indicated in the digest of this case in 95 A. L. R. 1249, the court seemed ''somewhat confused'' and premised its conclusion upon the ground that the woman who had paid $100 to be initiated into a fictitious lodge in which initiates received $500 in counterfeit money, had parted with nothing of value. The two Texas decisions which employed the minority rule and which, as we have seen, have since been succeeded by decisions employing the majority rule, added nothing to the discussion. Neither cited any authority upon the issue with which we are now concerned. In *State v. Crowley* (Wis.), supra, the court depended much upon the New York decisions, but contributed nothing towards the development of the reasoning employed by them. From the McCord decision it quoted the part which stated that ''neither the law or public policy designs the protection of rogues in their dealings with each other * * *.'' From the Stetson decision is quoted a passage in which the author of the opinion stated that he had not found any decision

holding an accused guilty under the statute in which the defrauded party's act had been unlawful. From the Clough case was quoted the preamble of the English statute saying that "subtle stratagems" had enabled rogues to defraud "industrious families." Justice Peckham's dissenting opinion in the McCord decision, which has greatly impressed virtually all other courts, was dismissed with the observation that *Commonwealth v. Henry* (Harris), supra, and *Commonwealth v. Morrill,* supra, both of which he cited, supported his views. We have already reviewed *State v. Alexander,* being the decision announced by this court. The above concludes our review of the reasoning employed by the minority courts.

Let us now review the reasoning employed by the majority. The McCord decision is principally notable for the dissenting opinion of Justice Peckham. Referring to *People v. Stetson,* in which, it will be recalled, the defendant had represented himself as a constable with a warrant for the arrest of his victim upon a charge of rape, Justice Peckham said:

"Many a weak and innocent man would have imitated the complainant in that case, rather than had a charge of such a character made against him before the public. In truth, the complainant in that case was guilty of no crime whatever in what he did, as the whole thing against him was a fiction. But the principle seems to be to hold him guilty in order to shield the villain who put him in so terrible a dilemma."

Continuing, he declared:

"This statute, it should be borne in mind, is not solely for the relief of the party defrauded. Its purpose is to punish a public offense, to punish and to prevent fraud, and to protect the weak and credulous."

He pointed out that the doctrine of particeps criminis is applicable only to civil litigation and is foreign to the criminal law. Concluding, he said:

"The false pretenses in this case are within the plain language of the statute."

The courts which employ the majority rule declare that the doctrine of particeps criminis is foreign to the criminal law. They point out that prosecutions instituted under statutes similar to ours are not for the protection of the victim, but for the protection of the public. They insist that such statutes contain no provision that the victim must be an honest, law-abiding person. The majority courts say that, instead of using the guilt of the victim as a shield for the defendant, it would be better to punish each for the wrong which he had done. The views expressed by Mr. Justice Holmes when a member of the Supreme Judicial Court of Massachusetts, in *Commonwealth v. O'Brien*, supra, have been re-echoed many times:

"As is pointed out by Peckham, J., in his dissent in 46 N. Y. 475, the criminal law has a public end in view, namely to deter people from swindling. With the greatest respect for the New York and Wisconsin courts, we think this end is more effectually reached if we do not read into the absolute words of the statute (Pub. Sts. c. 203, § 59) an implied exception which allows a knave to cheat any one out of his money if the knave can succeed in persuading his victim into a scheme which has any technical element of illegality on the victim's side. The question of allowing the latter a personal remedy is essentially different."

We shall review the reasoning of the majority no further.

Let us pause for a moment and review further the New York courts' treatment of their rule. In *People v.*

*Clough*, supra, the court indicated a belief that an alms-giver was not a particeps criminis with the beggar, although it admitted that the statute might warrant such a belief. It said:

"Looking to our statute, the man who merely gives to a beggar, without ordering him instantly to be taken into custody and carried before a justice of the peace, as he may do, Id. sec. 2, would seem to be a moral participant in the crime of vagrancy. It would sound somewhat extravagant, were we to apply a law severely penal to the protection of such an act."

In *People v. Koller*, 116 App. Div. 173, 101 N. Y. S. 518 (aff. 187 N. Y. 572, 80 N. E. 1116), necessity again compelled the court to circumscribe its doctrine of particeps criminis. It there refused to hold that the usurious character of a loan made the victim a particeps criminis with the defendant who was charged with having obtained it through the use of false representations.

Eventually the New York courts manifested displeasure with the entire rule which they were employing. For instance, in *People v. Tompkins*, supra, the Court of Appeals, after stating that the district attorney had made "a very able and elaborate argument" criticizing the McCord decision, said:

"Although it may be admitted that this rule, which exists only in New York and Wisconsin, is at variance with what now appears to be the more reasonable view adopted in at least twelve of our sister states, and although it may be conceded to be too narrow for the practical administration of criminal justice as applied to modern conditions, we are admonished that the rule is not with the courts but in the legislature. We can not change the existing rule without enacting, in effect, an ex post facto law."

It then quoted in italics a recommendation to the legislature made by the Appellate Division in *People v. Livingstone,* supra, as follows:

"We venture to suggest that it might be wise for the legislature to alter the rule laid down in McCord v. People."

In *People v. Livingstone,* supra, the court said:

"We very much regret being compelled to reverse this conviction. Even if the prosecutor intended to deal in counterfeit money, it is no reason why the appellant should go unwhipped of justice. We venture to suggest that it might be wise for the legislature to alter the rule laid down in McCord v. People, supra. * * * If the rule as to larceny by false pretense and by trick or device were made the same as the common-law rule that stealing property from a thief is the same crime as stealing from the true owner, we think this class of cases might be much more successfully dealt with. We know that a feeling prevails to some extent in the community that it is unjust that one offender should be punished and his co-offender obtain immunity. This feeling is absolutely unreasonable. Where one offender is punished, and another escapes, there may properly be a feeling of dissatisfaction, but the dissatisfaction should be, not because one man is in prison, but because the other man is out."

The rule employed in the New York and Wisconsin cases has been subjected to much criticism. In 24 J. Crim. L. 784, it is said that the McCord case "would seem to have been based upon a legal misconception from the first. The obvious distinction between civil suits and indictments for breaches of the criminal law was apparently overlooked." In 19 Minn. Law Rev. 474, which commends as correctly decided *State v. Foster,* supra, the commentator states:

"Thus, the defendant is amenable to a charge of larceny or embezzlement even though the property

taken was kept for an illegal purpose. Commonwealth v. Coffee, (1857) 9 Gray (Mass.) 139; State v. Donovan, (1919) 108 Wash. 276, 183 Pac. 127; Smith v. State, (1918) 187 Ind. 253, 118 N. E. 954, L. R. A. 1918D 688, or was wrongfully acquired. State v. Cloutman, (1881) 61 N. H. 143; State v. Patterson, (1903) 66 Kan. 447, 71 Pac. 860. Likewise, the fact that a person or a corporation has not complied with the statutory requirements for doing business in a particular jurisdiction is not a defense in a prosecution for embezzlement of his or its funds received from business done in that jurisdiction. People v. Wolff, (1909) 157 Mich. 242, 121 N. W. 754; State v. O'Brien, (1894) 94 Tenn. 79, 28 S. W. 311, 26 L. R. A. 252; Commonwealth v. Shober, (1897) 3 Pa. Super. Ct. 554.''

In *In re Cummins*, supra, the Colorado court showed that *People v. Williams*, 4 Hill 9, 40 Am. Dec. 258 and *People v. Stetson*, supra, upon which the New York court relied for its decision in *McCord v. People*, supra, did not support its holding. It likewise showed that the doctrine of particeps criminis was not essential to the holding announced in *State v. Crowley*, supra.

So far as we have been able to ascertain *State v. Alexander*, supra, has been cited only once by any other court. That citation is found in *State v. Foster*, supra, wherein the New Mexico court said: ''We cannot follow it * * * nor are we impressed with the soundness of the somewhat old decisions there cited. We consider their fallacy to have been exposed by Peckham, J., dissenting, in McCord v. Smith.''

 We are clearly satisfied that the doctrine of particeps criminis has no place in the administration of the criminal law. It has no more application to criminal jurisprudence than has the Rule of Contributory Negligence, which, it is well settled, is foreign to our system of criminal law: Bishop, Criminal Law (9th

Ed.), § 256. The doctrine of particeps criminis was incorporated in the civil law to avoid the grant of judicial aid to anyone who had done wrong. But if the doctrine is engrafted upon the criminal law it will have made a complete about face and become a dependable ally of the criminal. The purpose of the criminal law is the suppression of crime and the punishment, if not the suppression, of the criminal class. This objective cannot be attained through the use of one criminal as a shield for another, but can be facilitated by the punishment of both. The civil law is interested in neither individual if each cheats the other; but the criminal law is very properly interested in both. It is interested because its purpose is the punishment of all sharpers. The prosecution of a criminal proceeding is not begun by the victim of the wrongdoer. The victim's status is that of a witness. He may actually prefer that the cause be not begun, or, if begun, that it be dismissed. Indeed, he may even be languishing in jail as an unwilling witness. The fact that he, too, was guilty of something ought no more prevent conviction of the defendant than the unsavory past of any other witness. If two persons, pursuant to agreement, engage in a fight, the unlawful act of the one does not render the other immune from prosecution. Both are guilty of a breach of the peace. The fact that others, equally guilty, however numerous, are not being prosecuted has no bearing on the guilt of a defendant who is being prosecuted: *State v. Corologos*, 101 Vt. 300, 143 Atl. 284, 59 A. L. R. 1541. And the fact that liquor is kept for illegal sale does not constitute a defense for a defendant who destroyed it: *Nation v. District of Columbia*, 34 App. D. C. 453, 26 L. R. A. (N. S.) 996. But the all important fact is that there is no exception in the

statute in favor of those who cheat knaves. The statute does not incorporate within itself, at least not expressly, the rule of particeps criminis. The statute does not require that the victim's conduct when he was cheated shall have been entirely lawful. We are clearly satisfied that the statute is not susceptible to the interpretation championed by the defendants.

But *State v. Alexander*, supra, still remains as the decision of this court with its holding that a person who sought by penal means to gain something for himself is a particeps criminis of the more clever rogue who, by criminal means, cheated him. We are, therefore, confronted with the issue whether the doctrine of stare decisis demands that the Alexander decision be now followed, even though we are convinced that it was wrongly decided, or whether we are at liberty to overrule that decision and place upon the statute under consideration what we believe to be the proper interpretation; in other words, to give effect to the legislative intent. No one contends that these defendants knew of that decision until their industrious attorney discovered it.

██ We are not unmindful of the fact that this is a criminal case. We are well aware that no man ought to be convicted under a law which, in his instance, operates against him retroactively. However, the crime charged against the defendants is a statutory crime and its elements are those stated in the statute. In the application of the doctrine of stare decisis a distinction can be made, we believe, between crimes malum per se and crimes malum prohibitum so far as the compulsory character of the doctrine is concerned. We shall refer to this in greater detail later.

We mentioned in a preceding paragraph Professor Orfield's volume, Criminal Appeals in America. From its introduction by Dr. Roscoe Pound, we quote:

"In the epigrammatic phrase of Mr. Justice Holmes, historical continuity is not a duty, it is only a necessity. It is not that we ought to hew to what our forbears have done in the past as a matter of duty. But we find ourselves starting where they left off, building upon what they did and using the materials they left to us. In law we have to perceive how and why legal institutions arose, and to what ends, and with newer and better perceived and better understood ends, to adapt the institutions and materials which have come down to us to the tasks of social control in the time and place. Our materials are experience and reason and these, too, are the tools with which we fashion the materials, developing experience by reason and testing reason by experience. 'Every generation,' says Sir Frederick Pollock, 'takes up from its fathers, if it is worthy of them, a new starting point of imagination and aptitude, and the strange conservatism of the imaginative faculty is a sure warrant of continuity.'"

■■ The following statement of the doctrine of stare decisis made by Daniel H. Chamberlain (Chamberlain, Stare Decisis, 19; Prize Essay, 8 N. Y. Bar Rep. 69) has been highly commended (37 Harvard Law Rev. 409):

"A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of

the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible."

Mr. Chamberlain's statement appeals to us as excellent. Let us apply its test to the Alexander decision. Chamberlain's test says "made after argument." As indicated in a preceding paragraph, the Alexander decision was not preceded by an oral argument. The printed briefs of only one party argued the application of the doctrine of particeps criminis to the criminal law. Next, Chamberlain's test says, "necessary to its determination;" that is, to the determination of the appeal before the court. The Alexander decision charged Bannister (the victim) with knowledge of the statute which the defendant was accused of having violated, and, as the annotator of 95 A. L. R. says (at p. 1262) in criticism of that decision, "It will be observed that the representations in this case were on a question of law, as to which the prosecuting witness should have been as fully informed as the accused." Thus, since this court in the Alexander case had the sound reason just mentioned for its decision, which it developed and commented upon, resort to the doctrine of particeps criminis was unnecessary. Chamberlain's test further says, "its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness." Before these defendants committed their alleged offense, the New York Appellate Division, in the Livingstone decision (decided in 1900), had criticized as unsound the infusion of the rule of particeps criminis into the criminal law. Its words are quoted in a preceding paragraph of this decision. In 1906 the New York Court of Appeals, in the Tompkins decision, added to that criticism. It expressly said that the New York rule was "too narrow" for "modern conditions."

Both decisions recommended to the New York legislature that the criticized doctrine be abolished. It was abolished. See New York Penal Laws, § 1290. In 1934 *State v. Foster*, supra, said concerning the Alexander decision: "We cannot follow it * * *." Before the defendants had committed their alleged offense, the leading textbook on criminal law criticized the New York introduction of the doctrine of particeps criminis into the criminal law as being "alien" to that system, and commended the rule employed by the majority of states as in accord with "the general spirit of the criminal law": Bishop on Criminal Law (9th Ed.), § 469. See, to the same effect, Miller on Criminal Law, pp. 185 and 387. We quoted from a law review and from the Journal of Criminal Law and Criminology further criticism. Many courts, in language that yielded to no reserve, added to the criticism. See, for instance, *Cunningham v. State*, supra; *Gilmore v. People*, supra; *Commonwealth v. O'Brien*, supra; and *People v. Watson*, supra. The three extensive annotations already mentioned (13 Ann. Cas. 561, 17 L. R. A. (N. S.) 276, and 95 A. L. R. 1247) quoted and developed further criticism of the rule applied in the Alexander decision. It is evident that the Alexander decision was not in "agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law." *State v. Alexander* in many particulars fails to meet the test given by Chamberlain.

From Bishop on Criminal Law (9th Ed.) § 96, we quote:

"If what is done is malum in se, so that there is a consciousness of wickedness in doing it, there would be no weighty objection to overruling a former doctrine

clearly drawn, especially if it is upheld only by a single case.''

Fraud and deceit are universally condemned and anyone employing them has ''a consciousness of wickedness''. When these defendants, or one of them, altered the punchboard ticket and deceived their victim into a belief that in its altered condition it was genuine, they must have known that the common judgment of men would reproach them. The constitution of this state (Art. I, § 19) condemns fraud by recognizing a right to execution against the body of a judgment debtor who committed fraud. The statute in question, apart from inconsequential amendment, has been the law of this state since statehood.

■ Without further analysis, we state our belief that the doctrine of stare decisis does not prevent us from overruling that part of *State v. Alexander*, supra, which endeavored to infuse into the criminal law the doctrine of particeps criminis. In our opinion, the fact that the victim was endeavoring to do something immoral or unlawful at the time when he was cheated by a more clever scoundrel does not prevent the state from maintaining a prosecution against the latter. It follows from the preceding that the contention of the defendant which we have just been reviewing is without merit.

■ The defendant, W. L. Thompson, argues that the evidence fails to establish that he was in any way connected with the crime alleged in the indictment. The evidence is reviewed in a preceding paragraph. From it the jury had a right to believe that Thompson obtained from the face of the punchboard the identity of the winning number and from the board itself a slip, which, when altered, would bear the winning number.

It had a right to infer that he presented these two items to Mellenberger and thus enabled him to perpetrate the crime. Flight—and the jury had a right to believe that the defendants were so engaged when they were arrested—is evidence of guilt. The fact that there was in the car in which the defendants were riding at the time of their arrest a large quantity of material of an incriminating character is further evidence of guilt.

The circuit court did not err, we believe, when it received the jury's verdict. The judgment of the circuit court is affirmed.

RAND, C. J., and KELLY, BEAN, BAILEY and LUSK, JJ., concur.

BELT, J., not sitting.