Argued and submitted November 5, 1999, decision of Court of Appeals reversed; judgment of circuit court reversed; case remanded to circuit court for further proceedings September 14, 2000

## Lois STRANAHAN,
*Respondent on Review,*

*v.*

## FRED MEYER, INC.,
a Delaware corporation,
*Petitioner on Review.*

(CC 9110-06504; CA A88372; SC S45547)

11 P3d 228

Charles F. Hinkle, of Stoel Rives LLP, Portland, argued the cause and filed the briefs for petitioner on review.

Gregory Kafoury and Mark McDougal, Portland, argued the cause for respondent on review. Gregory Kafoury filed the brief.

Mark A. Anderson, Portland, filed a brief for *amicus curiae* ACLU of Oregon.

Eli D. Stutsman, Portland, filed a brief for *amicus curiae* Progressive Campaigns, Inc.

Linda K. Williams, Portland, filed a brief for *amicus curiae* AFL-CIO of Oregon.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.**

---

** Leeson and Riggs, JJ., did not participate in the consideration or decision of this case.

GILLETTE, J.

Van Hoomissen, J., concurred and filed an opinion.

## GILLETTE, J.

The underlying issue in this false arrest case is whether this court's decision in *Lloyd Corporation v. Whiffen,* 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*), correctly states the law of Oregon under Article IV, section 1, of the Oregon Constitution,[1] with respect to the right of initiative petitioners to utilize private property over the objection of the property owner. A majority of the Court of Appeals, considering itself bound by that precedent, concluded that it does. *Stranahan v. Fred Meyer, Inc.*, 153 Or App 442, 451, 958 P2d 854 (1998). For the reasons that follow, we now conclude that *Whiffen II* does not state correctly the law of Oregon on that subject. We therefore reverse the decision of the Court of Appeals.

We take our statement of facts from the Court of Appeals' majority opinion and the record, omitting those facts that relate to issues other than the one that is central to the case on review:

"Plaintiff Lois Stranahan brought this action for false arrest against defendant Fred Meyer, Inc. (Fred Meyer) * * * * * *

"* * * * *

"Stranahan has long been a political activist in Oregon, and has promoted her political beliefs through use of the initiative process. This political activity has often involved gathering signatures to put the initiatives she supports on the ballot. * * * At the time of the incident at issue in the present case, Stranahan was gathering signatures to put initiatives on the ballot concerning sales taxes and the rights of initiative petitioners. Fred Meyer, a chain of shopping centers, maintains that it has a right to exclude initiative petitioners such as Stranahan from its shopping centers and its property surrounding those shopping centers.

"On October 11, 1989, Stranahan and another signature-gatherer * * * were arrested for trespassing outside a

---

[1] The text of Article IV, section 1, of the Oregon Constitution, which enumerates the people's powers of initiative and referendum, is set out *post*. Any use of the terms "initiative petition" or "initiative petitioners" in this opinion encompasses both the people's powers of initiative and referendum.

Fred Meyer shopping center at Southeast 82nd and Foster, in Portland.[2]This litigation stems from that arrest."

*Id.* at 444.

Stranahan's actions throughout her petitioning activity and the ensuing arrest were peaceful. She had notified Fred Meyer management that she would be soliciting signatures, and she had been doing so for several hours at the time of her arrest. In the course of being arrested, Stranahan suffered physical injuries. She later filed this false arrest action against Fred Meyer, maintaining that she had a state constitutional right to be on Fred Meyer's property for the purpose of soliciting signatures, that her arrest therefore was unlawful, and that Fred Meyer should be required to respond in damages for the injuries that she had sustained. For its part, Fred Meyer argued that Stranahan had no such constitutional right and, therefore, that it was entitled to have her arrested for trespass when she refused to leave the premises after having been directed to do so by Fred Meyer personnel.

At the time when Stranahan was arrested, a number of legal proceedings had grown out of the efforts of various private property owners in Oregon, including Fred Meyer, to prevent petitioning activity on their property. To place the trial of Stranahan's action in context, we set out that procedural history here.

The first legal proceeding took place in 1984, when Fred Meyer obtained a restraining order that prevented a group of petitioners from soliciting signatures at its stores. Two years later, Fred Meyer obtained final judgments in two separate cases that also stated that Fred Meyer had a right to bar petitioning activity at its stores.

In February 1988, the Court of Appeals issued a decision that called the judgments in the earlier Fred Meyer cases into question. In *Lloyd Corporation v. Whiffen*, 89 Or App 629, 634, 750 P2d 1157 (1988) (hereafter "the Court of Appeals' decision in *Whiffen I*"), the Court of Appeals held

---

[2] The Court of Appeals characterized the Fred Meyer store at issue in this case as a "large[ ] shopping center" that, in addition to having its own various consumer departments, had tenant businesses that provided, among other things, banking services, shoe repair, and dry cleaning. *Stranahan*, 153 Or App at 454.

that a broadly worded injunction that prevented petitioning activity inside Lloyd Center, a large shopping center in Portland, implicated the petitioners' rights of free expression under Article I, section 8, of the Oregon Constitution.[3] The court further held that, although the owner of Lloyd Center could not ban such activity outright, it could adopt reasonable time, place, and manner regulations relating to that activity. *Id.* at 638-39.

Fred Meyer then sought to determine whether that decision—which, as noted, involved a large shopping center—applied to its stores. It did so by filing a complaint for an injunction against Lloyd Marbet, a petitioner who often worked with Stranahan on behalf of an organization known as the Coalition for Petition Rights (Coalition). On May 5, 1988, the trial court in the Marbet case held that the Court of Appeals' decision in *Whiffen I* did not apply to Fred Meyer stores and, accordingly, enjoined Marbet and all other persons petitioning with him from soliciting signatures on Fred Meyer's property. The Marbet case later was held in abeyance, pending this court's review of the Court of Appeals' decision in *Whiffen I*.

Meanwhile, on May 4, 1988, other petitioners from the Coalition, including Stranahan, were cited for trespassing on Fred Meyer's property when they refused to leave a Fred Meyer store after being directed to do so. At Stranahan's trial on that trespass charge in July 1988, the court ruled that the Court of Appeals' decision in *Whiffen I* did not apply to the Fred Meyer store at issue. Stranahan and the other petitioners thereafter were convicted of trespass.

In June 1988, in light of Fred Meyer's action against Marbet and the criminal case against Stranahan, the Coalition filed an action against Fred Meyer, seeking to enjoin Fred Meyer from prohibiting petitioning activity at its stores. A trial court rejected the Coalition's request, ruling that the Court of Appeals' decision in *Whiffen I* did not apply to Fred Meyer's stores. At about the same time, two additional trial

---

[3] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

courts in two other cases similarly ruled that the Court of Appeals' decision in *Whiffen I* did not apply to Fred Meyer's stores.[4]

In May 1989, this court affirmed the Court of Appeals' decision in *Whiffen I*. *Lloyd Corporation v. Whiffen*, 307 Or 674, 773 P2d 1294 (1989) (hereafter *"Whiffen I"*). However, the court did not reach the issue whether an injunction barring the petitioners from soliciting signatures inside Lloyd Center violated their free expression rights under Article I, section 8. Rather, the court addressed the case on what it characterized as "subconstitutional" grounds, 307 Or at 680, concluding that principles of equity required that the petitioners be allowed to solicit signatures inside Lloyd Center, so long as they did so reasonably, quietly, and peaceably, and without substantially interfering with the owner's commercial enterprise. *Id.* at 686-87. The court further held that the trial court could issue an injunction imposing reasonable time, place, and manner restrictions on petitioning activity inside Lloyd Center. *Id.* at 687-88. We discuss the reasoning set out in *Whiffen I* in greater detail later in this opinion.

Five months after this court's decision in *Whiffen I*, a petitioner was acquitted of trespassing on Fred Meyer's property, following a trial judge's ruling that she was within her rights to refuse to leave the property when asked to do so. Stranahan again was arrested that same month, on October 11, 1989, giving rise to the case at bar. At that time, the Marbet case still was pending. In February 1990, the trial court in the Marbet case reaffirmed its earlier ruling that *Whiffen I* did not apply to Fred Meyer stores and entered a declaratory judgment stating that Fred Meyer had a legal right to remove initiative petitioners from its stores.

At about that same time, the Court of Appeals reversed the earlier trespass convictions of Stranahan and others, which had arisen from their petitioning activity at a Fred Meyer store. *See State v. Cargill*, 100 Or App 336, 786

---

[4] More specifically, the court in one case held, as in the Marbet case, that no Fred Meyer store was bound by the Court of Appeals' decision in *Whiffen I*. The court in the other case held, in a more limited fashion, that the Court of Appeals' decision in *Whiffen I* did not apply to the Fred Meyer store in question.

P2d 208 (1990) (so ruling). Analyzing the case under Article IV, section 1, of the Oregon Constitution, the Court of Appeals concluded that it was "implicit" in that section "that the people must have adequate opportunities to sign the petitions that are necessary for them to act as legislators." *Id.* at 343. The Court of Appeals then held:

> "Article IV, section 1, * * * prohibits using a criminal prosecution to prevent the people from collecting signatures on initiative and referendum petitions in areas that have replaced traditional forums for the collection of signatures, so long as there is no substantial interference with the owner's use of the property for business or other purposes."

*Id.* at 348. This court affirmed by an equally divided court. *State v. Cargill*, 316 Or 492, 851 P2d 1141 (1993).

Meanwhile, in response to this court's decision in *Whiffen I*, the owner of Lloyd Center had adopted time, place, and manner restrictions that limited petitioning activity inside Lloyd Center. A group of petitioners attempted to solicit signatures outside the scope of those restrictions, and the owner responded by seeking an injunction. A trial court issued the injunction, and, in June 1991, the Court of Appeals affirmed, concluding that the restrictions were reasonable. *Lloyd Corporation v. Whiffen*, 107 Or App 773, 813 P2d 573 (1991). In March 1993, this court affirmed in part and reversed in part, reasoning that the right to initiate laws and constitutional amendments under Article IV, section 1, implicitly included the right to solicit signatures for initiative petitions in the common areas of large shopping centers such as Lloyd Center. *Whiffen II*, 315 Or at 514. We discuss the *Whiffen II* decision in greater detail later in this opinion.

Shortly after issuing *Whiffen II*, this court decided *State v. Dameron*, 316 Or 448, 853 P2d 1285 (1993), which involved a criminal defendant who had been convicted of trespass after soliciting signatures outside a Fred Meyer store that was located inside a privately owned shopping center. The Court of Appeals had reversed the conviction, reasoning that the defendant's actions constitutionally were protected under *Cargill*. This court affirmed the decision of the Court of Appeals, holding that the state had not proved that

the Fred Meyer store at issue was different in character from a large shopping center such as Lloyd Center. *Id.* at 461-62.

The trial in Stranahan's false arrest action against Fred Meyer commenced in February 1995. At trial, Fred Meyer introduced evidence that, in its view, demonstrated that the store at issue bore characteristics that distinguished it from a large shopping center. Both parties also introduced a number of appellate decisions into evidence, including *Cargill*, *Whiffen II*, and *Dameron*.

At the close of evidence, Fred Meyer moved for a directed verdict on the ground, *inter alia*, that the store at issue had not been opened to the public for petitioning purposes under *Cargill* and *Dameron*. The trial court denied that motion, concluding that the store fit within the facts of *Cargill* and *Dameron*, and, therefore, that Stranahan had a right to solicit signatures on the privately owned sidewalk outside the store. The court later instructed the jury to that effect and further instructed that Fred Meyer had a right to direct Stranahan to leave its premises, but did not have a legal right to have her arrested for trespass after she refused to do so.

The jury returned a substantial verdict in Stranahan's favor, including punitive damages totaling $2 million, which the trial court later reduced to $375,000. Stranahan appealed that reduction to the Court of Appeals, and Fred Meyer cross-appealed, contending, *inter alia*, that, under *Whiffen II* and *Dameron*, it had a right to prohibit petitioning activity at the store in question, because that store was different in character from a large shopping center.

A divided, en banc Court of Appeals affirmed on Fred Meyer's cross-appeal, specifically ruling that the trial court had not erred in denying Fred Meyer's multiple motions for a directed verdict.[5] *Stranahan*, 153 Or App at 454-62. The majority reasoned, in part, that the Fred Meyer store at issue

---

[5] The Court of Appeals reversed the trial court's decision to reduce Stranahan's punitive damages award and remanded with instructions to reinstate the jury's verdict. *Stranahan*, 153 Or App at 471. In light of our conclusion, discussed *post*, that Fred Meyer should have prevailed on its cross-appeal, we do not address the punitive damages issue.

was similar in character to the Fred Meyer stores involved in *Cargill* and *Dameron*, and that, like the owner of Lloyd Center in *Whiffen II*, Fred Meyer had extended a broad invitation to the public to shop there. It followed, in the majority's view, that Fred Meyer had not established that Stranahan's petitioning activity was unlawful, rendering baseless its defense to her claim of false arrest. *Id.* at 455. One judge concurred in the result, contending that the critical fact under *Whiffen II* was that Fred Meyer had invited the public to its stores for its own commercial business advantage. *Id.* at 477-78 (Leeson, J., pro tempore, concurring). Four judges dissented, asserting that, because the evidence did not demonstrate an intent on Fred Meyer's part to invite the public to do anything other than purchase consumer goods at the store in question, that store was not subject to Stranahan's right to solicit signatures under Article IV, section 1. *Id.* at 497 (Landau, J., dissenting).

Fred Meyer petitioned for review, contending, *inter alia*, that Article IV, section 1, does not create a right to solicit signatures for initiative petitions on private property and, consequently, that *Whiffen II* was decided incorrectly and should be overruled.[6] We allowed review to consider that issue.

We first note that, before this court's decision in *Whiffen II*, there had been a long history of federal constitutional litigation pitting the rights of persons engaging in political activity, such as petitioning, against the rights of private property owners. *See Marsh v. Alabama*, 326 US 501, 505-09, 66 S Ct 276, 90 L Ed 265 (1946) (holding that Jehovah's Witness who had been convicted of trespassing after refusing to stop distributing religious literature on sidewalk of "company town" could not be denied the right to express her freedom of religion and freedom of the press

---

[6] We note that Fred Meyer first raised the issue that *Whiffen II* was decided incorrectly in its petition to this court. Before the trial court and the Court of Appeals, which are bound to follow decisions of this court and have no ability to overrule such decisions, Fred Meyer argued instead that it should prevail under *Cargill*, *Whiffen II*, and *Dameron*, based on factual differences between the store in question and the shopping center and Fred Meyer stores at issue in those cases. Fred Meyer raises that argument in the alternative before this court.

under the First Amendment to the United States Constitution,[7] simply because a single company held legal title to the entire town); *Food Employees v. Logan Plaza, Inc.*, 391 US 308, 318-19, 88 S Ct 1601, 20 L Ed 2d 603 (1968) (extending *Marsh* rationale to peaceful union picketing activity outside shopping center; holding that shopping center was "functional equivalent[ ]" of business district in company town); *Lloyd Corp. v. Tanner*, 407 US 551, 561-64, 567-69, 92 S Ct 2219, 33 L Ed 2d 131 (1972) (retreating from "functional equivalency" discussion in *Logan Plaza*; confining *Logan Plaza* to its facts; holding that shopping center owner could prohibit political handbill distributions on its property); *Hudgens v. NLRB*, 424 US 507, 520-21, 96 S Ct 1029, 47 L Ed 2d 196 (1976) (rejecting contention that First Amendment required that union members protesting labor practices at employer's warehouse be permitted to picket employer's retail store located inside privately owned shopping center); *Pruneyard Shopping Center v. Robins*, 447 US 74, 80-88, 100 S Ct 2035, 64 L Ed 2d 741 (1980) (sustaining decision of California Supreme Court under California Constitution and holding that unwanted, reasonable petitioning activity in privately owned shopping center neither violated shopping center owner's right to free speech under First Amendment nor effected taking without just compensation under Fifth Amendment[8]).

■■ The foregoing Supreme Court cases can be summarized as follows. First, in determining whether the First Amendment protects petitioning or other political activity on private property, the test is not whether that property amounts to the "functional equivalent" of a public forum. Rather, a court must determine whether, under the facts of the particular case, it could be said that state action implicating the First Amendment has occurred. *Hudgens*, 424 US at 520-21; *Tanner*, 407 US at 562-63. Second, although the First Amendment generally is not implicated when persons

---

[7] The First Amendment to the United States Constitution provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press * * *."

[8] The Fifth Amendment to the United States Constitution provides, in part: "[N]or shall private property be taken for public use, without just compensation."

engage in petitioning or other political activity inside privately owned shopping centers, certain state constitutional provisions might mandate that such activity be permitted. *Pruneyard Shopping Center*, 447 US at 81. Finally, where such state constitutional provisions exist, the property owner's rights under the First and Fifth Amendments might or might not be implicated, depending on the facts of the particular case. *Id.* at 82-88.

The foregoing Supreme Court decisions provided the background against which this court has addressed the issue whether the Oregon Constitution requires permitting petitioning activity inside privately owned shopping centers, even when the owner objects to such activity. This court first addressed that issue in *Whiffen I*, which, as noted earlier, involved petitioning activity inside Lloyd Center. In that case, the trial court had entered an injunction that had restrained the petitioners from "entering upon [the owner's] private property to exercise their expressions of opinion or to gather signatures in the initiative and referendum process without [the owner's] permission or consent." 307 Or at 677 (internal quotation marks omitted). The Court of Appeals had reversed, reasoning that the injunction violated the petitioners' rights to free expression under Article I, section 8, of the Oregon Constitution, but that those rights constitutionally could be subjected to reasonable time, place, and manner restrictions. *Id.*

In affirming the Court of Appeals' decision on different grounds, this court avoided the constitutional issue. Rather, this court reasoned on a "subconstitutional" basis, *id.* at 680, that the equitable determination whether an injunction should be entered required a balancing of the interests involved—specifically, the public interest implicated in the people's power of initiative and referendum under Article IV, section 1, and the owner's interest in preventing injury to its commercial enterprise. *Id.* at 684-85. The court concluded that, under application of those equitable principles, the petitioners could not be enjoined from entering Lloyd Center because "[t]he solicitation of signatures of patrons does not in and of itself constitute substantial interference" with the owner's commercial enterprise. *Id.* at 687. In reaching that

conclusion, the court emphasized that the process of signature solicitation was a "fundamental principle of the Oregon government," *id.* at 684, and that the public policy behind that process "limits equitable enforcement of [the owner's] preferred total exclusion of signature solicitors." *Id.* at 687. Thus, although it did not base its decision on either Article I, section 8, or Article IV, section 1, the court did highlight the political importance of the ability to solicit signatures for initiative petitions.

As noted earlier, following this court's decision in *Whiffen I*, the owner of Lloyd Center adopted a number of restrictions limiting the ability of initiative petitioners to solicit signatures inside Lloyd Center. The owner's effort to enforce those restrictions led to this court's decision in *Whiffen II*. The trial court in that case had issued an injunction in favor of the owner of Lloyd Center, and the Court of Appeals had affirmed, concluding that the rules adopted were reasonable. Before this court, the owner contended that requiring it to allow petitioning activity on its private property violated the takings, free expression, and free speech provisions of the state and federal constitutions. The owner also contended that neither Article I, section 8 or 26,[9] nor Article IV, section 1, granted to the petitioners the right to solicit signatures inside a privately owned shopping center over the owner's objection. *Whiffen II*, 315 Or at 503-04.

The *Whiffen II* court began its analysis by disposing of the owner's contentions that compelling it to provide a forum for petitioning activity constituted a taking under either the state or federal constitutions. After assuming that the takings analysis under Article I, section 18, of the Oregon Constitution,[10] would be the same as the analysis under the Fifth Amendment to the United States Constitution, the court applied *Pruneyard Shopping Center*, 447 US at 82-85, and concluded that no "taking" of a constitutional dimension

---

[9] Article I, section 26, of the Oregon Constitution, provides, in part: "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good * * *."

[10] Article I, section 18, of the Oregon Constitution, provides, in part: "Private property shall not be taken for public use * * * without just compensation * * *."

had occurred. *Whiffen II*, 315 Or at 505-07. The court similarly disposed of the owner's assertion of its rights to free expression and free speech under Article I, section 8, of the Oregon Constitution, and the First Amendment to the United States Constitution, again applying a federal constitutional analysis to both provisions and concluding, under *Pruneyard Shopping Center*, 447 US at 85-88, that no constitutional violations had occurred. *Whiffen II*, 315 Or at 507-09.

The court then turned to the issue whether the initiative and referendum provisions of Article IV, section 1, of the Oregon Constitution, which the people originally adopted by legislative referral in 1902, conferred a right to solicit signatures for initiative petitions "on private property to which the public had been invited." *Id.* at 510. The court began by noting that, although the United States Supreme Court had concluded in *Tanner* that the First Amendment did not confer such a right, the Court also expressly had stated in *Pruneyard Shopping Center* that *Tanner* did not "limit the authority of [a] [s]tate to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Id.* at 510 (internal quotation marks omitted). The court then agreed with the holding in *Marsh*—a case decided under the First Amendment—that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* (internal quotation marks omitted).

Next, the court held in summary fashion that "persons may seek signatures in the common areas of the Lloyd Center, subject to reasonable time, place, and manner restrictions." *Id.* at 511. As support for that holding, the court cited Oregon's longstanding tradition of facilitating the process of signature solicitation, reiterating the statement in *Whiffen I* that such activity is a "fundamental principle of the Oregon government." *Id.* at 512 (emphasis and internal quotation marks omitted). The court also noted its agreement with the Court of Appeals' holding in *Cargill*, 100 Or App at 348, that Article IV, section 1, implicitly required that persons have adequate opportunities to sign initiative petitions.

*Whiffen II*, 315 Or at 512. Finally, the court cited *Pruneyard Shopping Center* and *Marsh*—again, both First Amendment cases—as support for its holding that Article IV, section 1, permits petitioning activity inside privately owned shopping centers, even over the owner's objection. *Id.* at 513-14. The court concluded its decision by reviewing the time, place, and manner restrictions imposed by the owner of Lloyd Center, striking the restrictions that it found "unduly restrictive" of the petitioners' right to solicit signatures, absent a showing that interference with the owner's commercial enterprise was so substantial as to place an "unreasonable burden" on the owner. *Id.* at 515-19.

Shortly after deciding *Whiffen II*, this court decided *Dameron*, 316 Or 448, which, as noted earlier, overturned the trespass conviction of a criminal defendant who had solicited signatures outside a Fred Meyer store that was located inside a privately owned shopping center. The issue in that case was whether the defendant unlawfully had remained on the premises within the meaning of ORS 164.245(1) (1993) and ORS 164.205(3)(b),[11] after being directed to leave by a person in authority. The Court of Appeals had reversed the defendant's conviction, reasoning that the defendant had engaged in constitutionally protected activity under *Cargill*. 316 Or at 455-56. On review, in affirming the Court of Appeals' decision, this court did not revisit its holding in *Whiffen II*. Indeed, the court concluded that, in light of the defendant's right under Article IV, section 1, to solicit signatures in the common areas of privately owned shopping centers (as set out in *Whiffen II*), the state bore the burden of proving that "the direction to leave the premises was lawful, *i.e.*, that the

---

[11] ORS 164.245(1) (1993) provided:

"A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in or upon premises."

ORS 164.205 provides, in part:

"As used in ORS 164.205 to 164.270, except as the context requires otherwise:

"* * * * *

"(3) 'Enter or remain unlawfully' means:

"* * * * *

"(b) To fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge[.]"

defendant had no legal right to ignore the direction to leave."
*Id.* at 460. The court then held that, because the state had
failed to prove that the Fred Meyer store in question was dif-
ferent in character from a large shopping center, the state
had not met its burden of proving that Fred Meyer lawfully
had requested the defendant to leave the premises. *Id.* at
461-62.

This court's decisions in *Whiffen II* and, to a lesser
extent, *Dameron*, lead us to the present case. As can be seen
from the foregoing case law summary, unless *Whiffen II* was
wrongly decided or, if correctly decided, is distinguishable in
some way, the Court of Appeals majority correctly ruled on
Fred Meyer's cross-appeal in this case. Before this court,
Fred Meyer's principal contention is that *Whiffen II*—specif-
ically, its Article IV, section 1, analysis—was decided incor-
rectly and, therefore, should not be followed. We turn to that
issue, but begin with some preliminary observations concern-
ing the methodology to be used when this court is asked to
reconsider a constitutional decision.

■ The question is one of *stare decisis,* a doctrine that
attempts to balance two competing considerations. On one
hand is the undeniable importance of stability in legal rules
and decisions. That consideration applies with particular
force in the arena of constitutional rights and responsibili-
ties, because the Oregon Constitution is the fundamental
document of this state and, as such, should be stable and reli-
able. On the other hand, the law has a similarly important
need to be able to correct past errors. This court is the body
with the ultimate responsibility for construing our constitu-
tion, and, if we err, no other reviewing body can remedy that
error. *See Hungerford v. Portland Sanitarium,* 235 Or 412,
415, 384 P2d 1009 (1963) ("[t]he pull of *stare decisis* is strong,
but it is not inexorable").

■■ We repeat a further observation concerning the doc-
trine of *stare decisis* made nearly a half century ago, but
equally apt today:

> " ' "A deliberate or solemn decision of a court or judge, made
> after argument of a question of law fairly arising in a case,
> and necessary to its determination, is an authority, or bind-
> ing precedent, in the same court or in other courts of equal

or lower rank, in subsequent cases, where 'the very point' is again in controversy; but *the degree of authority belonging to such a precedent depends, of necessity*, on its agreement with the spirit of the times or *the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law*, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible." ' "

*Landgraver v. Emanuel Lutheran*, 203 Or 489, 528, 280 P2d 301 (1955) (quoting *State v. Mellenberger*, 163 Or 233, 259, 95 P2d 709 (1939)), *overruled in part on other grounds by Hungerford*, 235 Or at 414 (emphasis added).

■■ Consistent with the foregoing, we remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question. We will give particular attention to arguments that either present new information as to the meaning of the constitutional provision at issue or that demonstrate some failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question. With those considerations in mind, we turn to Fred Meyer's arguments respecting the alleged defects in this court's decision in *Whiffen II*.

Fred Meyer argues, *inter alia*, that this court departed from its well-established methodology for construing constitutional provisions when it decided *Whiffen II*. Fred Meyer cites *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), as setting out the proper methodology for constitutional interpretation and notes the absence of that case from the court's discussion in *Whiffen II*. Fred Meyer asserts that, when the correct methodology is followed, it becomes clear that *Whiffen II* was decided incorrectly.

■ As a preliminary matter, we note that, when construing provisions of the Oregon Constitution, it long has been the practice of this court "to ascertain and give effect to the intent of the framers [of the provision at issue] and of the people who adopted it." *Jones v. Hoss*, 132 Or 175, 178, 285 P 205 (1930); *see also Oregonian Publishing Co. v. O'Leary*, 303 Or

297, 304, 736 P2d 173 (1987) (demonstrating that framers' intent, rather than isolated evidence of historical practices, governs constitutional interpretation). To ascertain that intent, this court has stated:

> "There are three levels on which [the] constitutional provision [at issue] must be addressed: Its specific wording, the case law surrounding it, and the historical circumstances that led to its creation."

*Priest*, 314 Or at 415-16.

*Priest*, which involved interpretation of an original constitutional provision, was decided almost a year before this court's decision in *Whiffen II*. Fred Meyer correctly notes that, although *Priest* represented this court's first clear statement of a methodology for ascertaining the intent of the framers and the people, the court long had followed a similar approach when interpreting other original provisions of the Oregon Constitution. *See, e.g., State v. Kessler*, 289 Or 359, 614 P2d 94 (1980) (analyzing wording, historical background, and relevant cases pertaining to right to bear arms set out in Article I, section 27). Further, before this court's decision in *Whiffen II*, this court had applied a *Priest*-like analysis in cases involving constitutional provisions and amendments that, like the initiative and referendum provisions of Article IV, section 1, were adopted by legislative referral. *See, e.g., State v. Gortmaker*, 295 Or 505, 668 P2d 354 (1983) (examining wording and history surrounding grand jury provisions adopted by legislative referral as Article VII (Amended), section 5).

Fred Meyer also is correct that, in *Whiffen II*, this court made no attempt to ascertain the intent of the people when they adopted the initiative and referendum provisions of Article IV, section 1. Neither did the court adhere to its usual methodology of examining the text, history, and case law surrounding an original constitutional provision, or one adopted by legislative referral, when it analyzed Article IV, section 1. The court instead concluded in summary fashion that Article IV, section 1, required that initiative petitioners be allowed to solicit signatures in the common areas of privately owned shopping centers, even when the owner objects. *Whiffen II*, 315 Or at 511. In its limited analysis, the court

also relied to a significant degree on the United States Supreme Court's decisions in *Marsh* and *Pruneyard Shopping Center*, both of which were decided under the First Amendment to the United States Constitution.

In short, Fred Meyer's criticism of the *Whiffen II* decision—specifically, the failure of that decision to follow this court's established methodology for ascertaining the intended meaning of a constitutional provision—is well taken. We therefore will reexamine the issue presented, *viz.*, whether Article IV, section 1, confers the right to solicit signatures for initiative petitions on private property over the owner's objection.

 Before doing so, however, we take this opportunity to clarify the interpretive methodology that is applicable here. As noted, before *Whiffen II* was decided, this court had set out in *Priest* a methodology for interpreting original constitutional provisions, which it generally also had followed in the past when construing constitutional provisions adopted by legislative referral. However, shortly after deciding *Whiffen II*, two other decisions of this court set out a slightly different methodology for interpreting constitutional provisions and amendments adopted by initiative petition. First, in *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993), the court stated:

> "In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. The best evidence of the voters' intent is the text of the provision itself. * * * The context of the language of the ballot measure may also be considered; however, if the intent is clear based on the text and context of the constitutional provision, the court does not look further. * * *"

(Citations and footnote omitted.) A year later, in *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994), the court reiterated the above-quoted methodology from *Roseburg School Dist.* and added that, "[i]f the intent of the voters is not clear from the text and context of the initiated constitutional provision, the court turns to the history of the provision." *Ecumenical Ministries*, 318 Or at

559 (footnote omitted). The court also noted that caution must be used before ending the analysis at the first level, *viz.,* without considering the history of the constitutional provision at issue. *Id.* at 559 n 7; *see also Coultas v. City of Sutherlin,* 318 Or 584, 590, 871 P2d 465 (1994) ("It is an unusual case in which the text and context of a[n initiated] constitutional provision reflect the intent of the voters so clearly that no alternative reading of the provision is possible.").

■ Here, Fred Meyer argues that we should follow the methodology set out in *Priest* to determine whether Article IV, section 1, confers a right to solicit signatures for initiative petitions on private property over the owner's objection. However, because the initiative and referendum provisions of Article IV, section 1, were adopted pursuant to legislative referral, rather than as part of the original Oregon Constitution, we conclude that we should apply the methodology set out for initiated constitutional provisions and amendments in *Roseburg School Dist.* and, more specifically, in *Ecumenical Ministries.* We make that distinction because of the inherent difference between original constitutional provisions and those later adopted or amended by legislative referral or initiative petition. As to the former, the drafters of the constitution crafted those provisions and submitted them to the people for approval without the benefit of an existing constitutional framework. In contrast, provisions or amendments created through either legislative referral or initiative petition are adopted by the people against the backdrop of an existing constitutional framework. It follows that, with respect to the latter provisions, it is the people's understanding and intended meaning of the provision in question—as to which the text and context are the most important clue—that are critical to our analysis.[12] We therefore proceed to analyze the relevant parts of Article IV, section 1, under the methodology set out in *Roseburg School Dist.* and *Ecumenical, Ministries. See generally OEA v. Roberts,* 301 Or 228, 231,

----

[12] We continue to emphasize that, in either case, our focus must be on the intent of the enactors of the provision at issue. *See Jones,* 132 Or at 175 (court's longstanding practice in constitutional interpretation is "to ascertain and give effect to the intent of the framers [of the provision at issue] *and* of the people who adopted it") (emphasis added).

721 P2d 833 (1986) (applying methodology similar to *Ecumenical Ministries* to part of Article IV, section 1, amended by legislative referral in 1968).[13]

 As always, we begin with the text of the constitutional provision at issue. Article IV, section 1, provides, in part:

> "(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

> "(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

> "(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

> "(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

> "(d) An initiative petition shall include the full text of the proposed law or amendment to the Constitution. A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith.

---

[13] We recognize that, on a few recent occasions, this court has elected to analyze constitutional provisions adopted by legislative referral under the *Priest* methodology. *See State v. Baker*, 328 Or 355, 359, 976 P2d 1132 (1999) (interpreting right to waive jury trial under Article I, section 11); *State ex rel Caleb v. Beesley*, 326 Or 83, 87, 949 P2d 724 (1997) (interpreting single-subject provision of Article IV, section 1(2)(d)). It does not appear that the difference in methodology led to a difference in outcome in those cases. On reflection, however, for the reasons set out in the text above, we will in this case and in future cases apply the methodology set out in *Roseburg School Dist.* and *Ecumenical Ministries* to constitutional provisions and amendments adopted by legislative referral.

"(e) An initiative petition shall be filed not less than four months before the election at which the proposed law or amendment to the Constitution is to be voted upon.

"(3)(a) The people reserve to themselves the referendum power, which is to approve or reject at an election any Act, or part thereof, of the Legislative Assembly that does not become effective earlier than 90 days after the end of the session at which the Act is passed.

"(b) A referendum on an Act or part thereof may be ordered by a petition signed by a number of qualified voters equal to four percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition. A referendum petition shall be filed not more than 90 days after the end of the session at which the Act is passed.

"(c) A referendum on an Act may be ordered by the Legislative Assembly by law. * * *

"(4)(a) Petitions or orders for the initiative or referendum shall be filed with the Secretary of State. The Legislative Assembly shall provide by law for the manner in which the Secretary of State shall determine whether a petition contains the required number of signatures of qualified voters. * * *

"(b) Initiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith."

Some significant points can be drawn from the foregoing text. First, Article IV, section 1, specifically defines the "initiative power" as the power to propose laws and constitutional amendments and to enact or reject them, and the "referendum power" as the power to approve or reject any bill passed by the legislature that meets certain criteria. Or Const, Art IV, §§ 1(2)(a) and (3)(a). Second, the manner of exercising such power is by circulating and filing a petition, signed by a requisite number of voters. Or Const, Art IV, §§ 1(2)(c) and (3)(b). Third, Article IV, section 1, sets out requirements for such petitions respecting content, signature requirements, and filing. Or Const, Art IV, §§ 1(2)(b) to (e), (3)(b), and (4)(a). However, nothing in the text speaks to the act of soliciting signatures for an initiative petition, let alone

suggests that petitioners have a constitutional right to engage in such activity on private property over the owner's objection.

The current wording of Article IV, section 1, was adopted by the people in 1968, pursuant to legislative referral. Before 1968, Article IV, section 1, provided, in part:

> "The legislative authority of the state shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than 8 per cent of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the secretary of state not less than four months before the election at which they are to be voted upon. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety) either by the petition signed by 5 per cent of the legal voters, or by the legislative assembly, as other bills are enacted. Referendum petitions shall be filed with the secretary of state not more than 90 days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. * * * The style of all bills shall be: 'Be it enacted by the people of the state of Oregon.' * * * The whole number of votes cast for justice of the supreme court at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the secretary of state, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor."

Or Const, Art IV, § 1 (1902). That wording was adopted as a constitutional amendment that was referred to the people by

the legislative assembly in 1902.[14] *See generally Ecumenical Ministries*, 318 Or at 554-55 (setting out original and amended versions of constitutional provision at issue as part of textual analysis).

As can be seen, the 1968 amendment restructured Article IV, section 1, and made a few changes, such as altering the signature requirements and imposing a single-subject limitation on initiated laws and constitutional amendments. *See generally Armatta v. Kitzhaber*, 327 Or 250, 272, 959 P2d 49 (1998) (one purpose of the 1968 amendment was to " 'clean-up' parts of the constitution, by repealing obsolete provisions and by combining the various initiative and referendum powers held by the people into one part of the constitution"). However, the 1968 amendment did not purport to alter the nature of the people's power of initiative and referendum, which had been in existence since 1902. *See generally State v. Campbell/Campf/Collins*, 265 Or 82, 89, 506 P2d 163 (1973) ("The explanation of the 1968 amendment in the official Voters' Pamphlet indicates that there was no intention in the drafting of the amendment to change the role of the legislature in connection with the exercise by the people of the initiative and referendum."). As was true after the 1968 amendment to Article IV, section 1, nothing in the text of the 1902 version spoke to the right of petitioners to solicit signatures on private property over the owner's objection. *See generally id.* at 89-90 (court analyzed Article IV, section 1, under 1902 version of that section, assuming that 1968 amendment made no substantive change with respect to legislature's authority in connection with initiative and referendum).

██ Our first level of analysis under *Ecumenical Ministries* also includes relevant case law interpreting Article IV, section 1. *See Coultas*, 318 Or at 589-90 (examining earlier

---

[11] The original version of Article IV, section 1, adopted as part of the original Oregon Constitution, provided:

"The Legislative authority of the State shall be vested in the Legislative Assembly, which shall consist of a Senate, and a House of Representatives. The style of every bill shall be 'Be it enacted by the Legislative Assembly of the State of Oregon,' and no law shall be enacted except by bill."

Or Const, Art IV, § 1 (1859).

case law construing initiated constitutional amendment in question).[15] That case law helps to define the parameters of the nature of the rights conferred by the initiative and referendum provisions of Article IV, section 1. For example, as its text demonstrates, the purpose of those provisions was to grant to the people the right to propose and reject legislation and to propose constitutional amendments, as well as to authorize the legislature to enact procedural regulations respecting the process. *See, e.g., Rose v. Port of Portland*, 82 Or 541, 552, 162 P 498 (1917) (Article IV, section 1, confers the "unfettered" right to initiate and enact laws or constitutional amendments, except to extent that the people themselves have limited it), *overruled in part on other grounds by State ex rel Heinig v. Milwaukie et al*, 231 Or 473, 479, 373 P2d 680 (1962); *State ex rel. Carson v. Kozer*, 126 Or 641, 644, 270 P 513 (1928) (Article IV, section 1, created "two law-making bodies, the legislative assembly on the one hand and the people on the other, which in the exercise of the legislative powers are coequal and co-ordinate"); *Kalich v. Knapp*, 73 Or 558, 581, 142 P 594, 145 P 22 (1914) (on rehearing) (in adopting Article IV, section 1, the people compelled the legislature "to share its powers of legislation with that of the people publicly expressed through the initiative"). Additionally, the right conferred by Article IV, section 1, encompasses the right to vote on a proposed law or constitutional amendment submitted by initiative petition or referral. *See State ex rel. McPherson et al. v. Snell*, 168 Or 153, 159, 121 P2d 930 (1942) ("The right of the people of the state * * * to vote upon any measure passed by the legislature is reserved to them by § 1 of article IV of the Oregon constitution."); *Loe v. Britting*, 132 Or 572, 578, 287 P 74 (1930) (Article IV, section 1, confers political right to vote on laws and constitutional amendments proposed by initiative petition.).

This court's Article IV, section 1, jurisprudence also has addressed petitioning activities, in particular, the solicitation of signatures. In *Campbell / Campf / Collins*, 265 Or 82,

---

[15] The first level of analysis also includes context, including related constitutional provisions that were in place when the provision in question was adopted. *See Comeaux v. Water Wonderland Improvement Dist.*, 315 Or 562, 569, 847 P2d 841 (1993) (considering such context when interpreting initiated constitutional amendment). However, we have not identified any such provision that could be said to shed light on the rights of initiative petitioners.

the court addressed the question whether a statute banning payment of persons who solicit signatures for initiative petitions contravened Article IV, section 1. The petitioners had argued that the statute severely hampered the "exercise" of their rights under Article IV, section 1, which—they contended—included a broad ability to solicit signatures. *Id.* at 90. The court first noted, as have we, that Article IV, section 1, was "silent as to the means of securing signatures." *Id.* The court then analyzed whether the statute at issue was a "reasonable regulation which facilitates the proper exercise of the initiative and referendum" or whether, instead, "by placing undue burdens on that exercise," the statute was inconsistent with the people's reservation of the initiative and referendum power.[16] *Id.* The court rejected the petitioners' contention that the statute unduly had burdened their ability to solicit signatures and, accordingly, upheld the statute.[17] *See also generally State ex rel. v. Snell*, 155 Or 300, 308-09, 60 P2d 964 (1937) (demonstrating that Article IV, section 1, encompasses right to sign initiative petition and have signature counted by Secretary of State).

Similar to the petitioners in *Campbell / Campf / Collins*, Stranahan contends in this case that Article IV, section 1, confers an unfettered right to solicit signatures, even on private property over the owner's objection. However, although *Campbell / Campf / Collins* arguably reinforces the proposition that the right conferred by Article IV, section 1, encompasses a right to solicit signatures for initiative petitions, it also demonstrates that that latter right is not

---

[16] The 1902 version of Article IV, section 1, itself, as well as this court's case law, clarifies that legislation of some sort was required to provide the procedures by which the initiative and referendum power conferred under Article IV, section 1, could be exercised. *See* 331 Or at 60 (quoting 1902 version of Article IV, section 1); *State ex rel. Carson*, 126 Or at 644 (so stating).

[17] The court noted that the statute at issue could be read to prohibit only payment for signature-gathering activity or also to prohibit payment for assisting an initiative campaign in some other form. *Campbell / Campf / Collins*, 265 Or at 94-95. Because the latter interpretation likely would have placed an undue burden on the petitioners' ability to engage in the initiative and referendum process, the court construed the statute to avoid that result, citing the principle of construction that regulatory legislation should be construed "in favor of the people's exercise of th[eir] rights [under Article IV, section 1]." *Id.* at 95. That principle is not applicable here, where we are construing not a regulatory statute, but Article IV, section 1, itself.

so broad or unlimited as the petitioners in that case, or Stranahan in this one, suggest. Indeed, in *Campbell/ Campf/Collins*, 265 Or at 90, the court declined to hold that Article IV, section 1, encompassed a constitutional right to pay for signature solicitation, in light of the fact that the constitution was silent in that regard. *See also Loe*, 132 Or at 577 (court declined to adopt reading of Article IV, section 1, unsupported by its wording, *viz.*, that right to vote on initiative petition was limited to taxpaying citizens).

■ In sum, the case law demonstrates that Article IV, section 1, confers an unfettered right to propose laws and constitutional amendments by initiative petition, and to approve or reject such proposed laws or amendments through the voting process. The case law also fairly can be read to hold that the power conferred by Article IV, section 1, encompasses that which is necessary to its exercise, such as the ability to solicit signatures for initiative petitions and the ability to sign such petitions. However, nothing in the case law suggests, much less requires, an affirmative answer to the issue before us here.

■ As can be seen from the foregoing, nothing in the text or case law surrounding Article IV, section 1, demonstrates that, in adopting its initiative and referendum provisions, the people intended to require private property owners to permit petitioning activity on their property. However, because, as the *Whiffen II* court noted, such activity arguably could be viewed as an integral part of the people's power of initiative and referendum under Article IV, section 1, and in light of this court's reluctance to end the interpretative analysis under *Ecumenical Ministries* prematurely, we also shall examine the history of the initiative and referendum provisions of Article IV, section 1. *See Ecumenical Ministries*, 318 Or at 559 n 7 (noting that "caution is required in ending the analysis before considering the history of an initiated constitutional provision"). Such history includes "sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure." *Id.* at 560 n 8.[18]

---

[18] *Amicus curiae* Progressive Campaigns urges that we consider, as part of the history of the initiative and referendum provisions of Article IV, section 1, the

As noted, the initiative and referendum provisions of Article IV, section 1, originated as a resolution in the Legislative Assembly that was referred to the people. That resolution was approved successively by the Legislative Assembly in 1899 and again in 1901, and was submitted to the people for a vote at the June 1902 general election. There is no material in the 1899 or 1901 session laws, or in any objective information that might have been provided to the voters in the Voters' Pamphlet for the 1902 election, that assists our determination of the scope of the people's power to initiate laws and constitutional amendments. *See Armatta,* 327 Or at 271 (noting lack of statements in June 1902 Voters' Pamphlet concerning proposed amendment to Article IV, section 1). Similarly, as to the 1968 amendment to Article IV, section 1, there is no historical information that speaks to the issue before us here. *See id.* at 272 (summarizing part of May 1968 Voters' Pamphlet); *Campbell / Campf / Collins,* 265 Or at 87, 89 (purpose of 1968 amendment was to change basis for signature requirements and to provide more time for signature certification). Neither have we found any other objective materials circulated to the public at large before the adoption of the initiative and referendum provisions of Article IV, section 1, that assist our interpretation of that provision. *See LaGrande / Astoria v. PERB,* 284 Or 173, 184 n 8, 586 P2d 765 (1978) (demonstrating that statements circulated to public at large can be indicative of intended meaning of measure at issue).

In sum, after considering the text, the relevant case law, and the history of the initiative and referendum provisions of Article IV, section 1, we have found nothing to support the conclusion set out in *Whiffen II, viz.,* that persons soliciting signatures for initiative petitions may do so on certain private property over the owner's objection. We therefore hold that Article IV, section 1, does not extend so far as to

---

methods of signature solicitation practiced immediately after the adoption of those provisions in 1902. We decline to do so, because such practices are not relevant to ascertaining the people's intent when they adopted the initiative and referendum process. *See generally Ester v. City of Monmouth,* 322 Or 1, 10 n 5, 903 P2d 344 (1995) (stating that subsequently enacted, related legislation is not evidence of people's intent in adopting initiated constitutional provision); *Oregonian Publishing Co.,* 303 Or at 304 (demonstrating that framers' intent, rather than isolated evidence of historical practices, governs constitutional interpretation).

confer that right. The contrary holding of *Whiffen II* was error, and it is disavowed.[19]

■ We now turn to the case at hand. Here, the legal premise underlying Stranahan's false arrest action against Fred Meyer is that she was within her rights under Article IV, section 1, to solicit signatures on Fred Meyer's private property, even over its objection. At trial, Fred Meyer moved for a directed verdict, in part on the ground that it had a legal right to direct Stranahan to leave its premises and, on her failure to do so, to have her arrested for trespass. In light of our conclusion that, in those circumstances, Article IV, section 1, does not confer the broad right asserted by Stranahan, we hold that Fred Meyer was entitled to a directed verdict on that ground. We reverse the contrary holding of the Court of Appeals and remand the case to the trial court for further proceedings.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**VAN HOOMISSEN, J.,** concurring.

The issue on review in this tort action for false arrest is whether plaintiff, Stranahan, had a state constitutional right to collect initiative petition signatures at the Fred Meyer store on Southeast 82nd Avenue and Foster Road in Portland. Defendant, Fred Meyer, argues that it cannot be held liable for that tort because Stranahan was committing criminal trespass at the time of her arrest.[1] Stranahan

---

[19] Although Stranahan does not assert it, certain of the parties *amici* urge this court to "expand" (their term) the *Whiffen II* decision on the basis of Article I, section 8, of the Oregon Constitution. Any such analysis would require this court to follow the analytical construct set out in *Priest*, 314 Or at 411, because Article I, section 8, is a part of the original constitution. *Amici* make no attempt to follow that (or any other) methodology, arguing instead for the outcome that they wish to see on policy grounds. However, as this court has attempted to explain in both the *Priest* and *Ecumenical Ministries* contexts, we are not free to interpret the constitution in any way that might seem to us to be sound public policy. Any analysis must begin with the constitution's own words. Lacking any assistance from *amici* in that respect, we decline to undertake on our own an effort to determine whether there is a basis for a different decision under Article I, section 8, than the one that we announce here under Article IV, section 1.

[1] A person commits criminal trespass in the second degree if that person fails to leave premises that are open to the public after being lawfully directed to do so by the person in charge. ORS 164.245; ORS 164.205(3)(b).

argues that she was not committing criminal trespass at the time of her arrest because, she asserts, she had a right under Article IV, section 1, of the Oregon Constitution[2] to enter and remain on Fred Meyer's property to collect signatures for an initiative petition. She relies on *Lloyd Corporation v. Whiffen*, 315 Or 500, 849 P2d 446 (1993) (*Whiffen II*). Fred Meyer responds that *Whiffen II* is distinguishable because that case concerned a substantially larger and more complex regional shopping center than its property here.

Fred Meyer argues in the alternative that *Whiffen II* should be overruled. The majority addresses that latter argument and concludes that this court was incorrect in holding, in *Whiffen II*, that persons who gather signatures for initiative measures have a constitutional right to engage in that activity in the common areas of large regional shopping centers, subject to reasonable time, place, and manner restrictions. As a consequence, the majority holds that Fred Meyer was entitled to a directed verdict on Stranahan's false arrest claim. Although I agree with that disposition of the false arrest claim, I do not agree with the majority's analysis. In particular, I conclude that the holding in *Whiffen II* is distinguishable and, therefore, does not control this case. The court's proper disposition of this case, then, is to explain why *Whiffen II* does not control here, not to overrule the constitutional holding of that case. I do not join in the majority's unnecessary decision to overrule *Whiffen II*.

---

[2] Article IV, section 1, provides, in part:

"(1) The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives.

"(2)(a) The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

"(b) An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition.

"(c) An initiative amendment to the Constitution may be proposed only by a petition signed by a number of qualified voters equal to eight percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition."

The precise issue in *Whiffen II* was the extent to which members of the public have the right to solicit initiative petition signatures at the Lloyd Center in Portland. The Lloyd Center is a regional shopping mall that houses over 100 separately owned retail stores and 100 professional and business offices. Five public streets cross the property and at least six other public streets run partly into and around it. The Lloyd Center contains a substantial amount of common space, including walkways, flower gardens, benches, information kiosks and open seating areas where the public can gather. *See Lloyd Corporation v. Whiffen*, 307 Or 674, 677-78, 773 P2d 1294 (1989) (*Whiffen I*) (describing the Lloyd Center property); *Lloyd Corporation v. Whiffen*, 89 Or App 629, 631, 750 P2d 1157 (1988) (same).

In *Whiffen II*, the property owner made two primary arguments. First, the owner insisted that being compelled to provide a forum for petitioners on its own private property amounted to a "taking" as contemplated by the state and federal constitutions. Second, the owner contended that the compulsion violated the state and federal free speech rights of the owner's tenants.

Rejecting both of those arguments, this court found a right to gather initiative petition signatures on at least some private property, *i.e.*, in "the common areas of large shopping centers," to be "implicit" in the initiative provisions of Article IV, section 1. *Whiffen II*, 315 Or at 512. According to the *Whiffen II* court, because access to people is the "life blood" of the initiative power, the Oregon Constitution must be read to permit the solicitation of initiative petition signatures at some locations that happen to be private property, subject to reasonable time, place, and manner restrictions. *Id.* at 511-13.[3] The *Whiffen II* court did not hold that those who solicit initiative petition signatures have an unlimited right

---

[3] In *Whiffen I*, 307 Or at 684-85, this court stated:

"One can hardly deny that the statutes recognize a right to sign petitions or to seek the signatures of others and a strong public interest in facilitating that process.

"\* \* \* \* \*

"Shopping malls have become part of American life. Large numbers of the public gather there. Although plaintiff tries to cloak a public mall as a private place, it is the antithesis of a private place."

to engage in that activity on private property. Instead, it narrowly circumscribed the right that it recognized.

The court relied on *Marsh v. Alabama*, 326 US 501, 66 S Ct 276, 90 L Ed 265 (1946), in which the United States Supreme Court held that a Jehovah's Witness had a First Amendment right to distribute religious literature on a sidewalk in a "company town" that was wholly owned by a local corporation. The *Marsh* Court based its holding on the fact that the corporation that owned the town essentially had invited the public to treat portions of the town as public property:

> "The more an owner, *for his advantage*, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the public and since their operation is essentially a public function, it is subject to state regulation."

*Id.* at 506 (emphasis added; citation omitted). After quoting from *Marsh*, the court concluded that the right to solicit initiative petition signatures on private property is limited to "the facts of [*Whiffen II*], which involve the common areas of a large shopping center such as the Lloyd Center." *Whiffen II*, 315 Or at 514; *see also Clackamas Town Center Assoc. v. Wolf*, 315 Or 557, 559, 849 P2d 477 (1993) (describing Clackamas Town Center as "a large shopping center similar to the Lloyd Center").

Under *Whiffen II*, the scope of the right to solicit initiative petition signatures on private property is determined by the scope of the property owner's invitation to the public. If a property owner invites the public to treat its property, or portions thereof, as public property, then members of the public who enter that property enjoy the same statutory and constitutional rights that they enjoy while using public property. As this court observed in *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 459 n 11, 857 P2d 101 (1993), the result in *Whiffen II* turned in large part on the unique history of the initiative right in Oregon and the fact that the property

in *Whiffen II* was open to broad public use. The broad public use analysis relied on an express or clearly implied invitation from the owner of the Lloyd Center to the public not only to shop, but to congregate in the shopping center for a variety of business, social, and recreational activities. For example, Lloyd Center invited the public to attend a multiple-screen motion picture theater, to skate at an ice-skating rink, to view artwork, to obtain services at a number of professional offices, (*e.g.*, lawyers, physicians, dentists), to attend meetings at designated meeting rooms, and to stroll or rest on multi-tiered walkways that linked dozens of unrelated retail businesses.

Turning to the facts of this case, the question is whether Stranahan had a right to be on Fred Meyer's private property for the purpose of collecting initiative petition signatures, such that Fred Meyer's order to her to leave the property was not lawful. I conclude that Fred Meyer's private property at issue here is significantly different from the private property at issue in *Whiffen II*.[4] The property at issue bears none of the characteristics of a town square. The space in the store is devoted to Fred Meyer's retail sales. The property also contains a restaurant and coffee shop, and persons who have purchased food or drink items may consume those items at tables in the restaurant and socialize in that context. However, the public invitation that the property implies is limited to ordinary commercial business, and does not include community socialization or recreational activities apart from the owner's retail business and that of its tenants.

On this record, I conclude that the focus of defendant's invitation to the public—commercial activity—distinguishes this case from *Whiffen II*. Defendant's use of a "one-stop shopping center" marketing concept has not transformed its private property into a large regional shopping center like the Lloyd Center or the Clackamas Town Center. The record does not support a finding that defendant expressly has invited the public to assemble on any portion of

---

¹ The Court of Appeals recently determined that *Whiffen II* did not entitle initiative petition circulators to gather signatures on the sidewalk outside of defendant's store at Southeast 39th Avenue and Hawthorne Boulevard in Portland. *Fred Meyer, Inc. v. Klein Campaigns, Inc.*, 168 Or App 259, 5 P3d 1194 (2000).

its private property for noncommercial purposes. Rather, the scope of defendant's invitation to the public is to shop for and to purchase its merchandise and that of the independent businesses on its property.

An issue substantially similar to the one decided in *Whiffen II* was addressed recently by the Supreme Court of Washington. In *Alderwood Assoc. v. Wash. Envir. Council*, 96 Wash 230, 635 P2d 108 (1981), that court held that the initiative provision of that state's constitution protected the right of initiative petitioners to gather signatures on the private property of a regional shopping center, which had become "the functional equivalent of a downtown area or other public forum." *Id.* at 244; 635 P2d at 116. In *Waremart v. Progressive Campaigns, Inc.*, 139 Wash 2d 623, 989 P2d 524 (1999), property owners asked the Washington Supreme Court to overrule *Alderwood*. The court declined to do so, stating:

> "[W]e are not inclined to overturn *Alderwood* because the 'doctrine [of *stare decisis*] requires a clear showing that an established rule is incorrect and harmful before it is abandoned.' Waremart has not met this substantial burden[.]"

*Id.* at 634, 989 P2d at 530 (citation omitted). The Washington court went on to conclude that the Waremart store in question was not the functional equivalent of a downtown area or other public forum and, therefore, that the petitioners in that case enjoyed no state constitutional right to gather signatures on Waremart's private property. *Waremart*, 139 Wash 2d at 637, 989 P2d at 531. That is precisely the approach I would take in this case. Accordingly, although I disagree with the majority's analysis, I concur in the majority's disposition of plaintiff's false arrest claim.